**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Jeffrey Stuart FALK, Defendant-Appellant.**

**No. 71–1213.**

United States Court of Appeals, Seventh Circuit.

Reheard En Banc Jan. 23, 1973.

Decided April 19, 1973.

Fairchild, Circuit Judge, concurred and filed opinion.

Cummings, Circuit Judge dissented and filed opinion in which Hastings, Senior Circuit Judge, and Pell, Circuit Judge, concurred.

Pell, Circuit Judge, dissented and filed opinion.

William J. Stevens, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gordon B. Nash, Jr., and William T. Huyck, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, KILEY, FAIRCHILD, CUMMINGS, PELL, and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal reheard *en banc* requires us to focus closely upon the dividing line between presumptive regularity in the enforcement of penal laws and impermissible prosecutorial selectivity.

Jeffrey Falk was charged in a four-count indictment with refusing to submit to induction into the Armed Forces and with failure to possess a registration card or his 1968 and 1969 I–A clas-

sification cards, all in violation of 50 U. S.C. App. § 462. The defendant filed a pretrial motion to dismiss those counts of the indictment charging him with failure to possess the proper cards on the ground that the prosecution sought the indictment for the improper purpose of chilling the exercise of rights guaranteed by the First Amendment and to punish him for participation in a draft counseling organization. The trial judge denied the motion without holding an evidentiary hearing. At trial, an offer of proof based on the same contention was similarly rejected. A jury found Falk guilty on all four counts, but the district court granted a post-trial motion for acquittal on count one on the ground that there had been no basis in fact for denying Falk classification as a conscientious objector. He received three consecutive one year sentences on the card-carrying counts.

On appeal, a panel of this court affirmed Falk's conviction, one judge dissenting. United States v. Falk, 472 F.2d 1101 (7th Cir. 1972). A petition for rehearing *en banc* was granted, in which the principal issue was the alleged discriminatory prosecutorial purpose in seeking the indictment. We have concluded that Falk is entitled to a hearing on his charge of an improper purpose. We accordingly reverse.

 The Fourteenth Amendment prohibits any state from taking action which would "deny to any person within its jurisdiction the equal protection of the laws." This admonition is applicable to the federal government through the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Washington v. United States, 130 U.S.App.D.C. 374, 401 F. 2d 915, 922 (1968). The promise of equal protection of the laws is not limited to the enactment of fair and impar-

tial legislation, but necessarily extends to the application of these laws. The basic principle was stated long ago in Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886):

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

The city ordinance for which violation Yick Wo was convicted made it unlawful for any person to maintain a laundry in the city of San Francisco without first obtaining the permission of the board of supervisors unless the laundry were located in a building constructed of brick or stone. Although the statute was, on its face, a fair and reasonable exercise of the police power, the facts showed that principally Chinese were refused permission to continue using wooden facilities. The Supreme Court held that criminal enforcement of the law was therefore illegal.

*Yick Wo* was concerned with an abuse of discretion in the administration of a public ordinance by a city licensing board, and not with the activities of law enforcement officials who presumably prosecuted all Chinese who violated the commands of the licensing board. The underlying principle has nevertheless been properly held to apply to the actions of prosecutors and police officials. Two Guys from Harrison-Allentown, Inc. v. McGinley, District Attorney, 366 U.S. 582, 588, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961);[1] United States v. Steele, 461 F.2d 1148, 1151 (9th Cir. 1972);[2]

---

1. In that case, the Court held that a lower federal court did not err in refusing to exercise its injunctive powers against a state prosecution of employees for violating a Sunday closing law, despite allegations of discriminatory enforcement, be-

cause "appellant's employees may defend against any such proceeding that is actually prosecuted on the ground of unconstitutional discrimination." *Id.*

2. *Contra,* Dear Wing Jung v. United States, 312 F.2d 73, 75 (9th Cir. 1962)

United States v. Crowthers, 456 F.2d 1074, 1080 (4th Cir. 1972); Shock v. Tester, 405 F.2d 852, 855 (8th Cir. 1969); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915, 924 (1968); Moss v. Hornig, 314 F.2d 89, 92–93 (2d Cir. 1963); People v. Walker, 14 N.Y.2d 901, 252 N.Y.S.2d 96, 200 N. E.2d 779 (1964); People v. Gray, 254 Cal.App.2d 256, 63 Cal.Rptr. 211 (1967); People v. Harris, 182 Cal.App.2d Supp. 837, 5 Cal.Rptr. 852 (1960). Cf., Littleton v. Berbling, 468 F.2d 389 at 410 (7th Cir. 1972).

Despite the seemingly undeniable application of *Yick Wo* to discriminatory prosecutions,[3] two questions have troubled various courts and appear to be the source of the disagreement between the majority and dissenters on this court. The first of these arises from the decision in Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), in which the Court noted that the "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," and went on to state that since it had not been alleged "that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification" there were no grounds to support a finding that the equal protection clause had been violated. From this it is argued that a person attempting to defend against the discriminatory enforcement of a law must show that he is a member of a class against which the law is being selectively enforced. *See, e.*

*g.,* United States v. Falk, *supra,* 472 F. 2d at 1106–1108; "Supreme Court, 1961 Term," 76 Harv.L.Rev. 54; 120–121 (1962).[4] We agree with Judge Lumbard in Moss v. Hornig, *supra,* 314 F.2d at 93, that *Oyler* does not preclude the granting of relief against intentional or purposeful discrimination against an individual. No intentional discrimination against the petitioner as an individual was alleged by Oyler and he merely attempted to show, by statistical evidence, that fewer than all multiple offenders were given heavier sentences: In the present case intentional discrimination is alleged. *Cf.,* Furman v. Georgia, 408 U.S. 238, 257, 293–295, 92 S.Ct. 2726, 2736, 33 L.Ed.2d 346 (Brennan, J., concurring), 408 U.S. 238, 306, 309–310, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring); Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944); Weisberg v. Powell, 417 F.2d 388, 392 (7th Cir. 1969).

■■ Falk's allegations indicate that he was singled out for selective and discriminatory treatment on the basis of activities which form an unjustifiable standard for selectivity in prosecution. Falk was an active member of a draft counseling organization known as the Chicago Area Draft Resisters. In his pretrial motion and again in his offer of proof he asserted that the prosecution against him for violation of the card-carrying requirements was brought not because he had violated the statute but to punish him for and stifle his and others' participation in protected First

---

(no authority cited and case merely states that lower court properly refused proof of discrimination in enforcement without distinguishing or noting *Yick Wo*).

3. There are decisions which deny the applicability of *Yick Wo* to allegedly discriminatory prosecutions. Those courts denying its applicability (generally in earlier cases) have given various reasons, such as that there is no right to commit a crime, that failure to prosecute all violators should not nullify a valid penal law and that there is a distinction between acts which are *malum prohibitum* and *malum in se.* *See* Comment, "The Right

to Nondiscriminatory Enforcement of State Penal Laws," 61 Colum.L.Rev. 1103, 1106–1107 (1961).

4. The author went on to note that "[i]n principle, it would appear improper to limit the equal protection clause to class discrimination alone since it condemns discrimination against 'any person'. The traditional emphasis on class discrimination seems but a recognition that often there may be no other means of proof that governmental action toward an individual results from an intent to discriminate against him in relation to others." *Id.*

Amendment activities in opposition to the draft and the war in Vietnam. There can be no doubt but that the expression of views opposing this country's foreign policy with regard to Vietnam is protected by the First Amendment. Schacht v. United States, 398 U. S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). And, just as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government.

Similar results have been reached in two recent cases. The most recent, United States v. Steele, 461 F.2d 1148 (9th Cir. 1972), involved a conviction for refusing to answer questions in a census report in violation of 13 U.S.C. § 221(a). The defendant argued that he had been deliberately selected for prosecution because of his participation in a census resistance movement. The Court of Appeals for the Ninth Circuit agreed that there was evidence that Steele had been singled out for prosecution on the basis of his exercise of First Amendment rights and concluded that his conviction could not stand under *Oyler* and *Yick Wo*.

Convictions were also reversed in United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972), on a finding that an unlawful and discriminatory purpose precipitated the indictments. The arrests in that case were for violations of a disorderly conduct regulation which prohibited loud and unusual noise and obstruction of passageways and a regulation forbidding the distribution of handbills without prior permission of the federal agency in whose space the material was to be distributed.[5]

The second source of disagreement among some courts and within this court concerns the problem of proof. Certainly, the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment is to be avoided. That does not mean that a criminal defendant is never to be afforded an opportunity to prove that the prosecution stems from an improper prosecutorial design or that he may never question a prosecutor under oath. The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice. However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about

5. The panel opinion in the instant case attempted to distinguish *Crowthers* on the ground that the activities involved there were protected First Amendment speech and thus could not constitutionally have been prohibited in any event. Evidence in that case did show "that the regulation was used as a subterfuge for prohibiting the expression of ideas with which the authorities disagreed." *Falk, supra,* 472 F.2d at 1109. No more than here, however, were the actual punished activities protected by the First Amendment. The lower court in *Crowthers* found, and the Court of Appeals agreed, that there was ample evidence that the defendants "created loud and unusual noise and obstructed the usual use of entrances, corridors, etc." 456 F.2d at 1078. There is no constitutional right to obstruct the passage of others or to engage in any manner of speech without regard to how it may interfere with the activities of other people in their businesses or homes. *See* Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L. Ed. 513 (1949); Cox v. Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 13 L.Ed. 2d 471 (1965); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The panel opinion also attempted to differentiate the present case from *Crowthers* on the basis that the government was using the statute in *Crowthers* as a subterfuge to suppress unpopular speech. Again, however, we see no distinction. Falk alleged that the government's purpose in bringing the indictment against him was to suppress the voicing of views similar to those which were attempted to be suppressed in *Crowthers*.

the prosecutor's purpose, we think a different question is raised.

Defendant in this case twice attempted to present evidence which would have shown an impermissible prosecutorial purpose. In his pretrial motion for dismissal of those counts of the indictment charging violations of the card possession requirements, the defendant expressed his belief that over 25,000 Selective Service registrants had dispossessed themselves of their draft cards without criminal sanction, and sought an evidentiary hearing at which he would submit evidence in proof of his allegations. In his motion for acquittal at the close of the government's case, Falk again attempted to show that the government was aware of many violations and that others were not being prosecuted, citing the policy statement of Lt. General Louis B. Hershey, Director, Selective Service System, Legal Aspects of Selective Service 47 (January 1, 1969, U.S. Government Printing Office), which states in relevant part:

"The escalation of the United States military involvement in Vietnam increased the draft calls, and there was an upsurge of public demonstrations in protest. Some of these protests took the form of turning 'draft' cards in to various public officials of the Department of Justice, the State or National Headquarters of Selective Service System, or directly to local boards. By agreement with the Department of Justice, registrants who turned in cards (as contrasted to those who burned cards) *were not prosecuted under Section 12(a) of the Military Selective Service Law of 1967,* but were processed administratively by the local boards." (Emphasis added.)

The Hershey statement goes on to say that many of these protesters were classified I–A, a policy which the Supreme Court found unacceptable in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970). It is, of course, possible that following the *Gutknecht* decision, the government changed its policy on non-prosecution. However, in view of its admitted policy not to prosecute prior to that decision we believe that in the particular circumstances of the instant case it was incumbent upon the government to come forward with evidence that it had in fact changed its policy generally or otherwise to explain why Falk was being singled out for prosecution in contravention of the government's own procedures.

The particular circumstances of this case which we believe compelled the government to accept the burden of proving nondiscriminatory enforcement of the law are several. Falk was, as noted earlier, actively involved in advising others on methods of legally avoiding military service and in protesting American actions in Vietnam. Similar circumstances, in which a vocal dissenter appeared to have been singled out for prosecution, led the court in United States v. Steele, *supra,* 461 F.2d at 1152, to hold that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." In the present case there are several indications that this was exactly the purpose of the prosecution. At the close of the trial Falk's attorney asked that the Assistant United States Attorney who tried the case be called as a witness, and offered to prove that the Assistant United States Attorney had told Falk's attorney at a meeting in December, 1970, that he knew of defendant's draft counseling activities, that a good deal of their trouble in enforcing the draft laws came from people such as Falk, that few indictments were brought for non-possession of draft cards, that defendant's draft-counseling activity was one of the reasons why the prosecution for non-possession of draft cards was brought, and that the government would not dismiss the card-carrying counts of the indictment even though Falk agreed to carry the cards in the future. The court refused the offer

of proof but did allow the Assistant United States Attorney to make a reply. We think the unsolicited reply is itself some evidence that Falk was singled out for special prosecution. Apparently in an effort to show that his own participation in the process of deciding to prosecute was inconsequential, the Assistant noted that the indictment against Falk was approved not only by him, but also by the Chief of the Criminal Division of the United States Attorney's Office, the First Assistant United States Attorney, the United States Attorney and the Department of Justice in Washington. It is difficult to believe that the usual course of proceedings in a draft case requires such careful consideration by such a distinguished succession of officials prior to a formal decision to prosecute.

The particular circumstances of this case which overcome the initial presumption of legal regularity in enforcement of penal laws also includes the lengthy delay in bringing the indictment. Falk returned his registration card to the Department of Justice on December 4, 1967, mailed his I–A classification notice to Federal District Judge Hubert Will in October, 1968 and sent a later notice of classification to his draft board in May, 1969. The government therefore had notice of his violations of the regulations from December, 1967. Yet the indictment charging violations of the card possession requirements was not returned until almost three years had passed, in October of 1970, following Falk's refusal to submit to induction in May of that year. Some explanation for the delay in prosecution for the earlier offenses may be found in a statement of policy by the Director of the Selective Service System:

"Selective Service Regulations are designed to delay the prosecution of a violator of the law until after he has failed to report for or refused to submit to induction or assigned civilian work. This is to prevent, wherever possible, prosecutions for minor infractions of rules during his selective service processing, thereby reducing the number of cases that reach the courts and also giving the registrant, before being prosecuted, an opportunity to report for service in the armed forces. Since the purpose of the law is to provide men for the military establishment rather than for the penitentiaries, *it would seem that when a registrant is willing to be inducted, he should not be prosecuted for minor offenses committed during his processing.* The result of this procedure is that the great majority of prosecutions involve the failure to report for or refusal to submit to induction or assigned civilian work." Legal Aspects of Selective Service, *supra*, 46–47. (Emphasis added.)

Although this statement would seem to provide a valid, and even in some cases benevolent, explanation for a delay of up to three years in bringing the indictment, it also adds forceful weight to defendant's contention that the prosecution in this case was for the purpose of punishing Falk for his exercise of First Amendment rights. According to this statement, it is government policy to prosecute only a portion of those who commit "minor infractions of rules;" whether a violator is one of those prosecuted depends upon whether he accepts or refuses induction. We may assume, at least for purposes of this case, that a general decision to prosecute those who refuse induction on grounds which will support a conviction to the exclusion of those who agree to cooperate with the Selective Service in the future is within the prosecutor's discretion. The problem in this case, however, is that Falk was found to have been justified in refusing induction in that he was entitled to classification as a conscientious objector. The result is that he faces three years' imprisonment because his local draft board arbitrarily and without grounds to so act refused his claim as a conscientious objector and he was forced to refuse induction in order to assert a valid claim, thereby also incurring prosecution for prior "minor infractions."

The conclusion would seem to be compelling that, in the admitted policy of the Selective Service officials and apart from whether Falk's draft counseling activities were involved in the decision to prosecute, he was indicted and prosecuted for violation of the card possession requirements only because he exercised his First Amendment privilege to claim a statutory right as a conscientious objector. But "[i]t is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups . . . by selective enforcement of an extremely broad prohibitory statute." Cox v. Louisiana, 379 U.S. 536, 557–558, 85 S.Ct. 453, 466 (1965); United States v. Crowthers, *supra*, 456 F.2d at 1080. See also Schacht v. United States, *supra*.

Punishment of Falk, however valid otherwise, only because he chose to assert his right as a conscientious objector, is very similar to the conduct of city officials who reinstated criminal charges for alleged traffic violations following the defendant's action in filing an official complaint charging police misconduct in Dixon v. District of Columbia, 129 U.S.App.D.C. 341, 394 F.2d 966, 968 (1968). Chief Judge Bazelon, in reversing the defendant's conviction on those charges, stated:

"The Government may not prosecute for the purpose of deterring people from exercising their right to protest official misconduct and petition for redress of grievances. Moreover, a prosecution under such circumstances would be barred by the equal protection clause, since the Government employs an impermissible classification when it punishes those who complain against police misconduct and excuses those who do not."

Similarly, the government is not free to punish those who refuse to acquiesce in a local draft board's irrational refusal to give a conscientious objector his proper classification while it excuses those who, however much their decision may conflict with moral principles, agree to submit to induction.

To summarize, the combination in this case of the published government policy not to prosecute violators of the card possession regulations, Falk's status as an active and vocal dissenter to United States policy with regard to the draft and the Vietnam War, the Assistant United States Attorney's statement that officials ranging from an Assistant Attorney to the Department of Justice in Washington participated in the decision to prosecute Falk, the untimely delay in bringing the indictment and the government's stated policy to prosecute only those who refuse induction while absolving those who submit to the will of the authorities, lead us to conclude that the district court erred in refusing a hearing on the offer of proof. The unrebutted evidence before the court, including the admission of the Assistant United States Attorney and the two published statements by the Selective Service officials which contradict the propriety of the action taken in this case, made out at least a *prima facie* case of improper discrimination in enforcing the law. We will therefore remand the case, to a different judge, for a hearing at which time Falk may question the Assistant United States Attorney as to the content of his previous statements to defendant's counsel [6] and present any additional evidence he wishes on the issue of other alleged violators and the govern-

6. Contrary to the panel opinion's assertion, there are other reported instances in which a prosecutor or other complaining official has been questioned regarding his actions. *See, e. g.,* Dixon v. District of Columbia, *supra*, 394 F.2d at 968 (Corporation Counsel); United States v. Steele, *supra*, 461 F.2d at 1151 (regional head of the census in Hawaii). Furthermore, this is not a case in which the motives of a prosecuting attorney are being probed. He is simply being asked to relate the content of a prior alleged admission regarding the government's purpose in bringing the prosecution.

ment's lack of general enforcement. In accordance with our holding that a *prima facie* case has already been presented, and in agreement with United States v. Crowthers, *supra,* however, the burden of going forward with proof of nondiscrimination will then rest on the government. Particularly with regard to the seemingly inherent discrimination against Falk in prosecuting him for insisting on his claim as a conscientious objector, we think the government will be required to present compelling evidence to the contrary if its burden is to be met. If the district court finds that the prosecution was not the result of a purpose to punish Falk for exercising First Amendment rights as a draft counselor and Vietnam protestor and is also satisfied that the government has not made an invidious discrimination between violators who acquiesce to the power of the Selective Service System and those who continue to assert their rights to be classified as conscientious objectors, the conviction will stand. If the court finds that Falk would not have been prosecuted for violation of the card possession requirements except for his assertion of a conscientious objector claim or his draft counseling and lawful protest activities, the indictment must be dismissed.

In conclusion, we wish to note our disapproval of the apparently frequent, and often too easy, practice of simply dismissing all allegations of illegal discrimination in the enforcement of criminal laws with a reference to Oyler v. Boles, *supra,* and its statement that the conscious exercise of some selectivity in the enforcement of laws does not violate the Constitution. That correct principle does not in many cases answer the question whether selective enforcement in a given case is invidious discrimination which cannot be reconciled with the principles of equal protection. As Judge Cummings reminded us in Stamler v. Willis, 415 F.2d 1365, 1369–1370 (7th Cir. 1969), cert. denied, Ichord v. Stamler, 399 U.S. 929, 90 S.Ct. 2231, 26 L. Ed.2d 796 (1970), "[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government."

We note finally that United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and Gutknecht v. United States, *supra,* do not in any way conflict with our holding in this case. The Supreme Court in *O'Brien* held that the First Amendment could not be interposed as a barrier to conviction for wilful destruction of a draft card. The issue in that case was whether the burning of a draft card was within the protection accorded "speech" or whether conduct was also an element. The issue of discriminatory prosecutions for violation of Selective Service regulations was not before the Court. Furthermore, *O'Brien* was concerned with the separate prohibition on wilful destruction of draft cards. But the Selective Service System has apparently always taken a different attitude toward public mutilation of these cards. In the excerpt from the Selective Service manual quoted earlier in this opinion, the Director of the Selective Service System stated only that "registrants who turned in cards (as contrasted to those who burned cards) were not prosecuted . . . ."

In the *Gutknecht* case, the Supreme Court held that the Military Selective Service Act of 1967 did not permit Selective Service officials to deprive registrants of their normal order of call in retaliation for violation of the card possession requirements, stating that criminal sanctions were the sole sanction permitted by Congress. Again, the Court was not concerned with the legality of even criminal sanctions resulting from selective unjustifiable discrimination in enforcement of the law.

Judgment of conviction vacated and cause remanded.

FAIRCHILD, Circuit Judge (concurring).

I agree that there has been a sufficient showing to warrant judicial in-

quiry into the motives of the prosecutor. This is indeed an exceptional area of national life where conscientious opposition to government policy has been intertwined with violations of the laws which implement the policy.

I would add one further point, with respect to the sentence imposed. Defendant was given an aggregate three year sentence for his card violations, as much as or more than he would probably have received if his induction order had been lawful. The judge apparently considered an ill-advised and offensive remark defendant made to his Board. In any event, the sentence appears grossly disproportionate to the circumstances of the offenses. I would readily concede that one who knowingly commits an offense as a means of protest deliberately risks the penalty. In a sense his exposure to sacrifice is a means of making his protest meaningful. On the other hand, the card offenses here can not be considered serious, nor to have threatened, under the circumstances, the government's legitimate objective in requiring the possession of cards.

Even if the prosecution were deemed lawful on remand, I believe the aggregate sentence must be substantially reduced.

CUMMINGS, Circuit Judge, with whom HASTINGS, Senior Circuit Judge, and PELL, Circuit Judge, join (dissenting).

Prior to his trial defendant moved to dismiss Counts II, III and IV of the indictment charging him with failure to possess his Selective Service registration card and his 1968 and 1969 I–A classification cards. The basis of his motion was that by seeking these counts of the indictment the Government denied him "equal protection of the law as that right is guaranteed in the due process clause of the Fifth Amendment to the Federal Constitution." In support of his claim he merely alleged that on information and belief over 25,000 Selective Service registrants had dispossessed themselves of their draft cards and that the supposed violators had not been indicted. He then alleged that his prosecution had been brought "not to enforce the Selective Service law, but for the unconstitutional purpose of punishing the Defendant for expressing his beliefs that the draft is wrong, that war is wrong, and for lawfully participating in an organization known as the 'Chicago Area Draft Resisters' (CADRE) * * * [and] for the purpose of chilling the exercise of right secured to the Defendant by the First Amendment * * *." Defendant requested an evidentiary hearing so that he could prove the alleged "unlawful purpose." The district court denied defendant an evidentiary hearing, although at the end of trial testimony he permitted defendant to make an offer of proof.

The majority holds that on the strength of the allegations in the pretrial motion to dismiss, defendant was entitled to an evidentiary hearing. If this be so, Senior Judge Campbell's observation that in criminal cases "[w]e now have eight trials to replace the original one!" [1] is outdated. In this Circuit there are now nine! For there are few criminal defendants who will be unable to make assertions as bald and unspecific as defendant's, and naturally there is now incentive to make them. If the magic in defendant's allegations is thought to lie in the assertion that defendant exercised his First Amendment rights, it is hard to imagine a criminal who cannot search his past to find that he too has exercised his right of free speech. Since defendant's draft-counseling work took place after his commission of the crimes, a criminal need only speak out after he has broken the law. Perhaps the magic is defendant's alleged espousal of viewpoints unpopular with the incumbent Administration. Thus if they have not already done so, criminals would be well advised to criticize some policy of the Government which may in-

1. Hon. William J. Campbell, Delays in Criminal Cases, 55 F.R.D. 229, 231 (1972).

dict them. Finally, the mere assertion that over 25,000 violators were not indicted lends no support whatever to an allegation of invidiously discriminatory prosecutorial selectivity, as will be demonstrated below. Any defendant could make a comparably meaningless allegation by stating that during some unspecified period of time he believed that, in absolute terms, an apparently large number of violators, not stated to be similarly situated, were not prosecuted.

### I.

Defendant alleged both that he believed over 25,000 Selective Service registrants had dispossessed themselves of their draft cards and had not been indicted and that his indictment had been brought for the purpose of punishing him for and chilling him in the exercise of his First Amendment rights. He claims that these allegations would support an unequal protection finding under Oyler v. Boles, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L.Ed.2d 446,[2] and that without more he is entitled to a hearing on his claim. The difficulty with this contention is obvious. If defendant were to prove exactly what he alleged concerning over 25,000 other registrants, he would not demonstrate anything of probative value to show that a line has been drawn between those who exercised their First Amendment rights and those who did not.

Defendant *did not allege or contend* at any time during the course of these proceedings that the supposed 25,000 registrants who were not prosecuted did not also engage in protected First Amendment activities. Nor did he allege they were similarly situated. Specifically he failed to state when these non-prosecuted registrants were supposed to have turned in their draft cards and whether or not their delinquencies were handled administratively. This is of elementary importance because prior to the Supreme Court's decision in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 decided January 19, 1970, card non-possession delinquencies were routinely handled administratively by punitively accelerating the registrants' induction dates or, in some cases, by reclassifying them.[3] See also Breen v. Selective Service Local Bd. No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed. 2d 653 decided January 26, 1970; compare Oestereich v. Selective Service Local Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402. Defendant himself had his induction date accelerated when he turned in his registration certificate, but the advanced date was canceled on April 1, 1970, shortly after *Gutknecht* was handed down. And no

---

2. In that case the Supreme Court stated:
 "Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged." 368 U.S. at 456, 82 S.Ct. at 506.
 Defendant argues that because he alleged that others were not prosecuted and that the purpose of his prosecution was unconstitutional, he did allege grounds supporting a denial of equal protection. I cannot agree. As explained in the text *infra*, it is essential for facial sufficiency that defendant allege a line

has actually been drawn between him, who possesses a certain characteristic, and others similarly situated who do not possess that characteristic. There is no disagreement, as the majority suggests, *ante* at 619, on the proposition that an individual can be the victim of invidious discrimination. (Even if "a person * * * must show that he is a member of a class against which the law is being selectively enforced," *ante* at 619, nothing precludes a class of one, provided the class is objectively discernible.) The essential point of disagreement is that the majority would hold sufficient to support a finding of a denial of equal protection that defendant's prosecution was badly motivated and that others, sometime, somewhere and however situated were not prosecuted.

3. This was done pursuant to 32 C.F.R. §§ 1642.12 and 1642.13.

allegation was made with reference to whether or not the 25,000 plus registrants actually submitted to induction. If the majority is correct in its assumption that there was a policy not to prosecute registrants for minor violations occurring during their processing unless they refused induction (*ante* at 622), this too is of basic importance.[4]

If the class of persons not prosecuted was not situated similarly to defendant in these basic respects, his equal protection violation claim must fail. Likewise if the class of persons not prosecuted was situated similarly to defendant but also voiced opposition to the war and the draft, etc., any claim that defendant was comparatively disadvantaged on the basis of his engagement in protected First Amendment activities would be unsustainable. Without these crucial allegations defendant's claim at best is that he was prosecuted for a crime which was routinely handled administratively until ten months prior to his indictment because he possessed a certain characteristic and that a large number of men (who may or may not have possessed that characteristic) were not prosecuted at some unspecified time in the past. If this unspecific and misleading allegation deserved a hearing to determine whether a defendant's prosecution violated equal protection, then it is inescapable that practically any defendant can precipitate such a hearing.

Perhaps this result would be tolerable if defendant were required at the outset to show that the 25,000 persons were different from him only in respect to the alleged impermissible selection factor. But it is apparent that defendant never intended to establish that the effect of the Government's prosecutive policy was to prosecute a card-dispossessing registrant only if he vocally op-posed governmental war policy, and the majority does not require him to do so. Rather, defendant wants, and now receives, a hearing to determine whether in his particular case the decision to prosecute was made for an invidious purpose—to punish him for and chill him in the exercise of his First Amendment rights. Let there be no mistake about this: the hearing is to determine the actual motive of the Government attorneys responsible for defendant's indictment principally through their own testimony.[5]

Cases relied on by the majority do not support the conclusion that defendant's dismissal motion allegations, if proved, would make out a prima facie equal protection denial. In Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 it was alleged in the uncontradicted petitions that consent of the supervisors to operate laundries in wooden buildings was withheld from all Chinese but granted to all Caucasians (save one) similarly situated. *Id.* at 359, 361, 374, 6 S.Ct. 1064. The Court found "the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons * * * as to amount to a practical denial by the state of * * * equal protection of the laws * * *." *Id.* at 373, 6 S.Ct. at 1073. In United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972), defendants alleged that although they were arrested for participating in various anti-war demonstrations under a disorderly conduct regulation which prohibited "conduct on property which creates loud and unusual noise, or which obstructs the usual use of entrances, foyers, [etc.] * * *," on sixteen prior occasions the Government allowed similar activities non-offensive to it where the level of noise was even

---

4. Furthermore, defendant failed to allege whether the prosecutors were aware of the existence of the 25,000 violators supposedly known to defendant, and *Oyler* would seem to hold the absence of such allegation to be fatal. 368 U.S. at 456, 82 S.Ct. 501.

5. See page 631, *infra.* Defendant has never contended he could prove the alleged "unlawful purpose" without interrogating the prosecutorial officials who decided to seek his indictment.

greater than that of defendants'. The court found that to be a fact and concluded the selection was "made not by measuring the amount of obstruction or noise but because of governmental disagreement with ideas expressed by the accused." *Id.* at 1079. In *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), the defendant alleged that the census authorities applied an unjustifiable standard in selecting persons for prosecution. In support thereof, he alleged that the only persons selected for prosecution were himself and three others who had vociferously participated in a census resistance movement, and that many other persons who had provided census officials with no more information than he had were not prosecuted, but these had not taken a public stand against the census. *Id.* at 1151. He was partially successful in proving his allegation.

The common thread running through these decisions was an allegation and a showing that the effect of the administrative or prosecutive policy was a division between persons otherwise similarly situated according to whether or not they possessed a certain characteristic.[6] But again, defendant never alleged or offered to prove, or at any time during the course of these proceedings took the position that those registrants who turned in their draft cards and were not prosecuted were similarly situated to defendant except that they had not engaged in protected First Amendment activities. Unless the impact or effect of challenged governmental action is actually to discriminate between persons or classes according to an impermissible basis of selection, no denial of equal protection can be made out. See *Palmer v. Thompson*, 403 U.S. 217, 225–226, 91 S.Ct. 1940, 29 L.Ed.2d 438. Thus although defendant contends his prosecution violated equal protection (due process, see *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884), his claim

lacks the essential stuff of an equal protection violation.

Defendant's case, then, comes to this: without making any effort to establish that the effect of the Government's prosecution is to differentiate between him and others on an impermissible basis, he would have a court inquire into the actual motivation behind the Government's indictment and rule his prosecution unconstitutional solely on the basis of a wrongful prosecutorial purpose. But the "purpose" of the executive, as Falk uses the term, is not a basis for declaring this otherwise valid prosecution unconstitutional.

In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, the import of which the majority understandably sidestepped, O'Brien argued that the 1965 amendment to the Universal Military Training and Service Act of 1948, prohibiting the knowing destruction or mutilation of Selective Service registration and classification certificates, was unconstitutional as applied to him and unconstitutional because "what he calls the 'purpose' of Congress was 'to suppress freedom of speech.'" *Id.* at 376, 88 S.Ct. at 1678. The Supreme Court, assuming O'Brien's draft-card-burning had a sufficiently communicative contest to bring the First Amendment into play, rejected his first argument because the Government had a substantial interest in ensuring the smooth functioning of the Selective Service System, because the 1965 amendment was an appropriately narrow means of protecting this interest and condemned only the noncommunicative impact of the conduct in its reach, and because the noncommunicative impact of O'Brien's draft-card burning frustrated the Government's interest. *Id.* at 376–382, 88 S.Ct. 1673. What is important for this case is that the unanimous Supreme Court also rejected O'Brien's second argument. O'Brien wanted the Court to look at

---

6. See also *Littleton v. Berbling*, 468 F.2d 389 (7th Cir. 1972), *certiorari granted*, 411 U.S. 915, 93 S.Ct. 1544, 36 L.Ed.2d 306.

statements by legislators and the historical context in which the statute was enacted in order to divine the "purpose" or "motive" of Congress in passing the law. The Court could not have more firmly refused O'Brien's invitation to make this inquiry and use it as a basis for declaring the Act unconstitutional. Chief Justice Warren, writing for the Court, stated:

" * * * the purpose of Congress, as O'Brien uses [the] term, is not a basis for declaring the legislation unconstitutional.

"It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. As the Court long ago stated:

" 'The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.' McCray v. United States, 195 U.S. 27, 56, 24 S.Ct. 769, 49 L.Ed. 78 (1904)." Id. at 383, 88 S.Ct. at 1682.

Falk now asks this Court to look at statements of Government attorneys and the surrounding circumstances in order to divine the purpose or motive for his indictment. We should even more firmly decline this invitation. Since the reasons behind the O'Brien Court's refusal to use Congressional purpose or motive as a sufficient vehicle to strike down an otherwise constitutional statute are grounded in the judiciary's institutional competence and the doctrine of separation of powers, they apply with equal, if not greater, force to close the door to judicial inquisition into the purpose or motive of the executive in seeking an otherwise valid indictment. This could not have been made more explicit than in the following passage from Justice Edward Douglass White's opinion in McCray v. United States, 195 U.S. 27, 24

S.Ct. 769, 49 L.Ed. 78, whose undiminished vitality the Court reaffirmed in O'Brien:

"Whilst, as a result of our written constitution, it is axiomatic that the judicial department of the government is charged with the solemn duty of enforcing the Constitution, and therefore, in cases properly presented, of determining whether a given manifestation of authority has exceeded the power conferred by that instrument, no instance is afforded from the foundation of the government where an act which was within a power conferred, was declared to be repugnant to the Constitution, because it appeared to the judicial mind that the particular exertion of constitutional power was either unwise or unjust. To announce such a principle would amount to declaring that, in our constitutional system the judiciary was not only charged with the duty of upholding the Constitution, but also with the responsibility of correcting every possible abuse arising from the exercise by the other departments of their conceded authority. So to hold would be to overthrow the entire distinction between the legislative, judicial, and executive departments of the government, upon which our system is founded, and would be a mere act of judicial usurpation.

"It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus, by abusing the power, it may be made to accomplish a result not intended by the Constitution, tall limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this: that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful pow-

er wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department.

"The proposition, if sustained, would destroy all distinction between the powers of the respective departments of the government, would put an end to that confidence and respect for each other which it was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions.

\* \* \* \* \* \*

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."

McCray v. United States, *supra* at 53–55, 24 S.Ct. at 775; see also Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162 (Chief Justice Marshall).

The type of inquiry which O'Brien asked the Supreme Court to make and which Falk now proposes can lead to only an assumption of bad governmental purpose. Not only is it true that what motivates some legislators will not be the purposes other legislators have in mind (*O'Brien, supra*, 391 U.S. at 384, 88 S.Ct. 1673), but also a motive to stifle a type of expression, for example, may coexist with a purpose to ensure the smooth functioning of the Selective Service System in the mind of any legislator. It would, therefore, have been a very risky business, indeed, to strike down the 1965 amendment in *O'Brien* on the basis of statements by legislators and the circumstances surrounding debate, and, as the Supreme Court put it, "the stakes are sufficiently high for us to eschew guesswork." *Id.* 391 U.S. at 384, 88 S. Ct. at 1683. In the case at bar, Falk's indictment was drafted by someone in the United States Attorney's Office in Chicago, approved by the Chief of its Criminal Division, by the First Assistant United States Attorney, by the United States Attorney, and by the Department of Justice in Washington. Whose motivation is supposed to be decisive of the Government's purpose in prosecuting Falk? And doubtless any evil purpose will be coincident with a purpose to enforce the law. Indeed, in his offer of proof defense counsel stated he expected an Assistant United States Attorney to testify that "one of the reasons" defendant was prosecuted was his draft-counseling activities. As explained later, I do not believe that to be an impermissible reason, but if a court feels otherwise, is it to engage in the guesswork of trying to determine the "dominant" purpose? *O'Brien's* answer is an emphatic "no." See also Palmer v. Thompson, 403 U.S. 217, 225, 91 S.Ct. 1940, 29 L.Ed.2d 438. Unless a judge has made an indefensible *a priori* determination, this type of judicial inquiry must only lead to an assumption. And it is simply not the function of the judiciary within our constitutional scheme to void otherwise valid governmental acts solely on the basis of such an assumption. The fact that Falk proposes to call the officials responsible for his indictment to the witness stand does not alleviate the problem but rather exacerbates it. It is the ultimate transgression of judicial authority to haul the executive to the witness stand for examination by a criminal defendant as to why it has chosen to indict him.[7]

---

7. See Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479, 481 (1967) (then Judge Burger).

Furthermore, if a court dismisses an indictment because it decides a base motive has inspired it, presumably the Government will be able to reindict the defendant and survive the court's motive scrutiny by making a "wiser" statement about it. *O'Brien, supra,* 391 U.S. at 384, 88 S.Ct. 1673; *Palmer, supra,* 403 U.S. at 225, 91 S.Ct. 1940. If the court would not accept reindictment, or as in the case at bar, would reverse a conviction because of its motive assumption, a criminal will have violated the law with complete impunity and obtained an immunity bestowed on the most uncertain of grounds. And finally, what a court would, in essence, be doing is invalidating a prosecution, which the executive undoubtedly had the power to initiate, "on the ground that it is unwise." *O'Brien, supra,* 391 U.S. at 384, 88 S.Ct. at 1683. This cannot be the judiciary's proper function. ·

## II.

Recognizing only the practical problems of "government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment * * *,"[8] the majority finds this pro-

cedure acceptable when the defendant makes the perfunctory allegations and "presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose * * *." *Ante* at 620. Naturally the majority cites no precedent for this proposition. I have been unable to find a single case where a United States Attorney or his superiors in the Department of Justice were required to explain their motives for seeking an indictment at a defendant's behest and as a part of his case under any circumstances, and the majority has cited none.[9] The majority employs the term "reasonable doubt," but if the "facts" which the majority marshals raise such a doubt, then criminal juries, which operate under the same standard, must routinely free the guilty.

First of all, the only "fact" which defendant presented in his motion to dismiss was his belief that over 25,000 Selective Service registrants had turned in their draft cards but gone unindicted. As shown, *supra* at 626–627, this allegation is meaningless. The majority decides the district court was wrong in not granting the hearing requested in defendant's motion to dismiss. But since it does not, and hardly could, deem proof

---

8. It is questionable whether the majority pays more than lip service to the practical problems involved in allowing defendants to put government prosecutors on the witness stand in order to probe prosecutorial motivation. In this case defendant's indictment was approved by several echelons of government attorneys including officials in the Justice Department. If the Government's purpose in seeking to indict defendant is really to be discerned, all of these officials would have to testify since the testimony of any one of them, especially the lowest level prosecutor's, would hardly establish the Government's purpose, if indeed the testimony of all of them could. See notes 12 and 13 *infra*. Presumably the defendant well understood this since he moved to have all persons "who authorized or considered the advisability of indicting Mr. Falk" produced. The majority attempts to narrow the circumstances under which this unique procedure will occur by stating that the defendant must present facts sufficient to raise a reasonable doubt about the Govern-

ment's purpose. But as demonstrated in the text *infra,* this standard amounts to virtually no limitation at all. It is not difficult to picture the chaos which will reign. See Goldberg v. Hoffman, 225 F.2d 463, 467 (7th Cir. 1955).

9. The majority cites only Dixon v. District of Columbia, 129 U.S.App.D.C. 341, 394 F.2d 966 (1968), and United States v. Steele, 461 F.2d 1148 (9th Cir. 1972). *Ante* at 623 n. 6. The latter referred to testimony by the Regional Technician for the census in Hawaii, not a federal prosecutor. Judge Bazelon's opinion in the former case, not joined in by the two other members of the panel, referred to testimony by a former Chief of the Law Enforcement Division of the District of Columbia's Corporation Counsel. However, neither in that opinion nor in the *Steele* decision is there anything whatsoever to indicate that the official was called to the witness stand by the defendant as a part of his case.

of the "over 25,000" allegation sufficient to warrant calling the prosecutors to the stand, the defendant, even if he had been granted the hearing, could not have simply put the prosecutors on the stand. I have previously indicated my disagreement with the assertion that defendant's skeletal motion to dismiss deserved a hearing. Assuming, however, that a hearing should have been granted, the record, as well as defendant's briefs and arguments in this Court, makes it perfectly clear that all defense counsel really had in mind was putting prosecutors on the witness stand. Immediately after the motion to dismiss was denied, defendant filed a motion "to produce the following agents and employees of the Government * * * Stephen Kadison, Assistant United States Attorney, [e]ach officer or employee of the Justice Department of the United States of America who authorized or considered the advisability of indicting Mr. Falk for nonpossession of draft cards." When defendant was given the opportunity to make an offer of proof on his contention, he only proceeded to call Assistant United States Attorney Kadison to the stand and, when the district judge became aware of the implications of this tack and cut it short, defense counsel completed his offer of proof merely by stating what he expected the prosecutor to say. But it would be circular reasoning to use as one of the "facts" justifying calling the prosecutor to the stand what the prosecutor said when he was on the stand and what defense counsel stated he expected him to say.

The only other "fact" presented in the record is the statement of General Louis B. Hershey, Director, Selective Service System, in Legal Aspects of Selective Service 47 (January 1, 1969, U. S. Government Printing Office), which defendant included in his motion for acquittal. This statement is as follows:

"The escalation of the United States military involvement in Viet Nam increased the draft calls, and there was an upsurge of public demonstrations in protest. Some of these protests took the form of turning 'draft' cards into various public officials of the Department of Justice, the State or National Headquarters of Selective Service System, or directly to local boards. By agreement with the Department of Justice, registrants who turned in cards (as contrasted to those who burned cards) were not prosecuted under Section 12(a) of the Military Selective Service Law of 1967, but were processed administratively by the local boards."

The statement as of January 1, 1969, by its terms refers to a situation existing prior to that date wherein "[b]y agreement with the Department of Justice, registrants who turned in cards (as contrasted to those who burned cards) *were* not prosecuted under Section 12(a) of the Military Selective Service Law of 1967, but *were* processed administratively by the local boards." [10] (Emphasis supplied.) How that statement, hearsay as to Justice Department policy to begin with, has any applicability to Falk, who was indicted in October 1970, escapes comprehension. Furthermore, prior to the Supreme Court's decision in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532, decided January 19, 1970, the Selective Service System routinely deal with card non-possession delinquencies by punitively accelerating the registrants' induction dates or reclassifying them. *Gutknecht* outlawed the punitive measure of accelerating induction dates and together with Breen v. Selective Service Local Bd. No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653, finally put to rest the punitive reclassification procedure. See Oestereich v. Selective Service Local Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402.

---

10. For dealing with delinquent registrants who held statutory exemptions, the Selective Service System's administrative procedure of revoking those exemptions was outlawed in Oestereich v. Selective Service Local Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402, decided December 16, 1968.

Hence the *raison d'etre* for the nonprosecutive policy—administrative handling by the local boards—was removed. The majority finds it suspicious that the Government, instead of blinking at criminal conduct, should enforce the law by prosecution when the administrative means of enforcement—the only other alternative to crime with impunity—was foreclosed. Respectfully, it appears any suspicion is a product of predisposition.

In sum, not only is there no support for the majority's newly fashioned "reasonable doubt" standard for cross-examining prosecutors as to their motives in seeking an indictment, but also the "facts" presented by defendant are so far from raising such a doubt that they fail to amount to a scintilla.

The majority concludes, after examining the "unrebutted evidence" before the trial court, that defendant "made out at least a *prima facie* case of improper discrimination." *Ante* at 623. Initially, the majority has indefensibly usurped the trial court's function of determining fact in reaching this conclusion. More importantly, since nothing defendant alleged or offered to prove went to the status of the persons not prosecuted, defendant's case went not to establishing discrimination but rather to establishing a bad purpose behind his prosecution. But assuming the truth of everything defendant alleged or offered to prove— all that is properly before us [11]— defendant did not come close to making out a *prima facie* case of the unconstitutional "purpose" he alleged.

As already demonstrated, proof of the bare allegation that 25,000 Selective Service registrants who turned in their draft cards were not prosecuted is meaningless. Likewise, as shown previously, the Hershey statement is not probative. When called as a witness on defendant's offer of proof, Assistant United States Attorney Kadison stated that he did not draft defendant's indictment but believed he was involved in making the decision whether or not to prosecute defendant. Defense counsel stated he expected to prove that this prosecutor was aware of defendant's activities as a draft counselor and that Mr. Kadison had previously told him: that the Government would be unable to prove unlawful counseling or urging evasion of the draft against Mr. Falk, but they believed that a good deal of their trouble in enforcing the Selective Service law had been coming from people like him, that it was sometimes unusual to bring an indictment for non-possession of cards, that Mr. Falk's counseling activities were one of the reasons why the prosecution for nonpossession of draft cards was brought, and that he was not sure of the Government's case on Count I against defendant. Defense counsel told the district court that Mr. Kadison had made these statements to him on December 8, 1970, when defense counsel visited the prosecutor's office to request the dismissal of Counts II, III and IV in return for defendant's agreement to carry his cards. Mr. Kadison told the court that defendant's indictment had already been drafted when he joined the United States Attorney's Office, that it was approved by the Chief of the Office's Criminal Division, the First Assistant United States Attorney, the United States Attorney, and the Department of Justice and that he had had very little to say about the actual decision whether or not to prosecute.

As explained earlier, the majority's use of the prosecutor's statements and supposed statements to infer an unconstitutional governmental motive for indicting Mr. Falk serves as the best possible illustration why consideration of motive or purpose is not open as the basis for voiding an otherwise valid governmental act. Moreover, the majority's unexplained assumption that Kadison's testimony would be admissible to prove the Government's purpose in bringing the prosecution, *ante* at 623 and n. 6, is very dubious as an evidentiary matter. His out-of-court statements to defense

11. See Moss v. Hornig, 314 F.2d 89, 93–94 (2d Cir. 1963).

counsel are not introducible in defendant's case as admissions of the Government,[12] nor could he testify as to the Government's motives in prosecuting Falk.[13] He could only speak for himself.

But putting to one side these basic infirmities of the majority's unprecedented approach, if indeed Falk's draft counseling activity was one of the reasons why the prosecution was brought, that is hardly an impermissible reason for prosecution. Quite the contrary. As stated in the panel decision, "select enforcement of a law against someone in a position to influence others is unquestionably a legitimate prosecutorial scheme to secure general compliance with the law." 472 F.2d at 1108. Nowhere does the majority choose to dispute that proposition. Instead it quotes from United States v. Steele, 461 F.2d 1148, 1152 (9th Cir. 1972), to the effect that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." As a general proposition, and certainly under the circumstances of this case, I cannot subscribe to that view. Though such a procedure may be vulnerable to that charge, at least in cases such as this, where it is ridiculous to expect prosecution of all violators, it is likewise consistent with the sensible enforcement scheme of securing general compliance through prosecution of those who defiantly violate the law in the public eye. It is well within the realm of prosecutorial discretion to take into account the personal characteristics of the defendant, and among those his visibility and influence over others may quite properly weigh heavily in the decision whether to prosecute.

The majority relies on the statement of Mr. Kadison that defendant's indictment was approved by several echelons of prosecutorial officials as "some evidence that Falk was singled out for special prosecution." *Ante* at 622. First of all, the majority has simply assumed it was the card non-possession counts of the indictment that were the subject of the multi-leveled review, but there is nothing in the record to substantiate that. But even operating on that assumption, the majority's inference seemingly smacks of prepossession.

Certainly no one would expect Federal prosecutors to expend their limited resources on indicting and trying all Selective Service registrants who have violated the card possession requirements. In the fall of 1970, when Falk was indicted, recourse to the usual administrative procedure for dealing with draft card delinquencies was no longer open, and prosecution was the only means available for enforcing the regulations. That the United States Attorney's Office would want carefully to consider proposals for indicting registrants in order to insure that the prosecutions had sufficient potential for effecting deterrence and securing general compliance to justify the expenditure of limited resources is a reasonable approach indeed. And, as I have said before, unquestionably it is a sound enforcement technique to prosecute the notorious violator or counselor, to whom others look, in order to deter would-be violators and promote general compliance. Furthermore, if all violators cannot be prosecuted, the United States Attorney's Office has an interest in carefully reviewing proposals to prosecute in order to insure decisional uniformity as a matter of fairness to the registrants.[14]

The Justice Department, at a time when a large prosecutorial responsibility

12. See United States v. Santos, 372 F.2d 177, 180–181 (2d Cir. 1967); United States v. Keogh, 271 F.Supp. 1002, 1008, n. 22 (S.D.N.Y.1967).

13. See United States v. Powers, 467 F.2d 1089, 1095 (7th Cir. 1972), certiorari denied 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178.

14. Cf. Rabin, Agency Criminal Referrals in the Federal System: An Empirical Study of Prosecutorial Discretion, 24 Stan.L. Rev. 1036, 1065 (1972).

had just been created as a result of Supreme Court decisions, must have had similar concerns in obtaining maximum enforcement without needless expenditure of resources better spent elsewhere, if possible, and also in insuring a nationwide uniformity among the various United States Attorneys' Offices' decisions to prosecute these violators. Consequently, if the multileveled approval procedure was used in Falk's case, it is beside the point that it is not the usual course of proceedings in the universe of all draft cases, *ante* at 621, and it hardly follows that defendant was singled out according to an impermissible selection factor. Finally, the multileveled approval procedure is inconsistent with any governmental purpose to punish defendant for being a draft counselor and opposing the war unless one is willing to assume that even the Justice Department was so petty as to approve the indictment out of a small-minded animus against one Jeffrey Stuart Falk. I would view the several approvals involved here as a prophylactic against arbitrariness on the part of a low level prosecutor as well as against non-uniform treatment and wastefulness.

Apparently cognizant that support for defendant's argument about the purpose of his prosecution was lacking, the majority devised another argument, not advanced by the defendant. This argument leads to the conclusion that defendant was "indicted and prosecuted for violation of the card possession requirements only because he exercised his First Amendment privilege to claim a statutory right as a conscientious objector." *Ante* at 623. The argument's curious dialectic is as follows: The Government had notice of defendant's first violation of the card possession regulations when defendant mailed his registration card to the Department of Justice on December 4, 1967, but did not indict him until October of 1970, after Falk had refused to submit to induction.[15] Falk was indicted both for refusing to report and for violating the card possession requirements. The Selective Service System had a policy that, wherever possible, a registrant should not be prosecuted for minor offenses committed during his processing if he is willing to be inducted.[16] Although this policy is generally sound, in this case Falk was acquitted of the refusal to report charge because the district court concluded he was entitled to classification as a conscientious objector. Therefore, "the conclusion would seem to be compelling that * * * he was indicted and prosecuted for violation of the card possession requirements only because he exercised his First Amend-

15. The majority finds suspicious the delay between the dates defendant turned in his draft cards (December 1967, October 1968, and May 1969) and the date of his indictment in October 1970. *Ante* at 621–622. It then posits that "some explanation" for the delay may be found in a policy statement of the Director of the Selective Service System to the effect that prosecutions for minor violations occurring during their processing should be foregone if the registrants are willing to be inducted. *Id.* However, the majority neglects to mention that during almost the entire period, defendant's delinquency was being handled administratively under then prevailing practice. In June 1968 defendant was declared a delinquent for his December 1967 dispossession, and after the completion of a pending administrative appeal of his classification, his draft board rewarded his delinquency with an accelerated induction date in November 1968. Although defendant's induction date was postponed while he was allowed to seek another classification, it was not until April 1970 that, pursuant to Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532, the Selective Service System abandoned its measure of administratively dealing with defendant's card dispossession by accelerating his induction date. At that time defendant was rescheduled for induction in his regular sequence of call, and when he refused to report in May 1970, he was indicted the following October.

16. Although not implausible, there is nothing in the record to indicate that this was the policy of the Justice Department or of any United States Attorney's Office.

ment privilege to claim a statutory right as a conscientious objector." *Ante* at 623.

If this argument is valid, it follows that whenever a defendant is acquitted of a failure to report charge because his local board somehow erred in not awarding him a requested classification other than I–A, the court must automatically acquit the defendant of accompanying "minor" infraction charges of which he is proved guilty. But of course the argument is invalid. There is no logical way the court's acquittal on the refusal of induction charge can retroactively taint the prosecutor's decision to indict for other violations as well. Unless the prosecutor is expected to possess clairvoyance, he can hardly be faulted for seeking to indict the defendant for all violations he was believed to have committed. The defendant violated the card possession requirements and cannot gain immunity from prosecution simply because he was not indicted for so doing until after he refused induction. His First Amendment rights were freely exercised when he claimed CO status. No First Amendment rights were implicated in anything that transpired thereafter.

To summarize, the principal points of my disagreement with the majority are as follows: First, the bare-boned and conclusionary allegations in defendant's motion to dismiss did not deserve a hearing. Second, defendant's allegations were facially insufficient to sustain a claim that he was denied equal protection of the laws. Third, the "purpose" of his prosecution, as defendant uses the term, is not a basis for declaring that prosecution unconstitutional. Fourth, it is not permissible for a defendant to call a prosecuting attorney for the United States or his superiors to the witness stand for interrogation as to the Government's motive for prosecuting him. Fifth, assuming the propriety of the majority's approach and the truth of everything defendant alleged and offered to prove, defendant did not make out a *prima facie* case that his prosecution was impermissibly brought, much less that he was denied equal protection.

Finally, I could hardly take issue with the proposition that "[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government." Stamler v. Willis, 415 F.2d 1365, 1369–1370 (7th Cir. 1969), certiorari denied, 399 U.S. 929, 90 S.Ct. 2331, 26 L.Ed.2d 796. However, the judiciary can only exercise that responsibility within the confines of its institutional competence in our constitutional system. Even if it is conceded that the executive acted lawlessly in prosecuting the defendant out of an evil animus, this Court likewise acts lawlessly when it undertakes to right a wrong it has no competence to right. Unless the Court suggests that its purposes or motives may be inquired into and their nobility balanced against the baseness of the executive's, I fail to see how the Court's action can be any less lawless than the executive's. As noted previously, the Supreme Court stated in McCray v. United States, 195 U.S. 27, 55, 24 S.Ct. 769, 776, 49 L.Ed. 78:

> "It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies not in the abuse by the judiciary of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."

I respectfully dissent.

PELL, Circuit Judge (dissenting).

I concur in the dissenting opinion of Judge Cummings. While the acute analysis in that opinion of the particular case before the court scarcely needs amplification, nevertheless, because of the

policy implications of the majority opinion on the administration of criminal law enforcement, I feel compelled to add these words of dissent.

While a majority of the judges of this court have joined in Judge Sprecher's well-written opinion, I, respectfully to the good judgment which I am aware they possess, am of the opinion that insufficient consideration has been given to the far-reaching impact of the law now established by the majority opinion. The ripples of that opinion will permeate far beyond the factual reaches of this case for erosion once permitted is not easily contained. That the present opinion may constitute a minuscular crack in the sluice gate does not mean that *Falk* has not established as a principle that the motivation of the public prosecutor as to an individual defendant may be scrutinized. Once the right of scrutiny has been established, the methodology and range of scrutiny will undoubtedly be coextensive with the right. That inquiry will perforce necessitate another trial within a trial in which the involved prosecutorial staff will by their testimony attempt to go forward with the proof burden placed on them by the majority, that of showing nondiscriminatory motivation.

I offer no apologies for, nor approbation of, the prosecutor who may be improperly motivated in a case involving a particular individual. Such conduct is beneath both the dignity and the purpose of the office to which is entrusted the enforcement of our criminal laws on an objective basis. Because prosecutors along with the rest of public officials are subject to human frailities, and may on occasion let those characteristics override propriety, it does not, in my opinion, justify a case-by-case ad hoc determination of the question. Mr. Justice Frankfurter observed that our system of criminal justice necessarily depends on conscience and circumspection in prosecuting officers [1] and with that

no one would quarrel. The question here, however, is whether the occasional malmotivation should be the basis for opening with considerable regularity this new line of defense or whether the matter should not be properly left to the "people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power." [2]

That the claim of improper motivation, a dragnet of infinite magnitude in its scope of assertion, will not be advanced with considerable regularity appears to me to be ignoring the realities implicit in sophisticated defense tactics. I think I can safely venture the opinion that a substantial number of law violators react to prosecution with a feeling they are being singled out. The sweep is broad, ranging from the recipient of a parking ticket who resents the fact that the large black Cadillac by a fireplug is unmolested to the Al Capone who is prosecuted for violation of the income tax laws. Each will now have a new weapon, not to prove that he did not commit the crime with which he is charged but only to defeat the penalty which the legislature has decreed for his aberrant behavior.

The particular case before the court has arisen from a situation which Judge Fairchild has properly characterized as "an exceptional area of national life." The fact that this country's involvement in the conflict in Southeast Asia has generated emotionalism and divisiveness within the citizenry such as has been seldom experienced does not justify the establishment of a rule of law which can only have a deleterious effect on a proper administration of criminal justice. The claims of Falk may well cause us as individuals to feel that he was singled out for prosecution for reasons other than that he had violated the law. This surface allure does not, however, in my opinion, justify our intervention as the judiciary nor does it gainsay that in

1. United States v. Dotterweich, 320 U.S. 277, 285, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

2. McCray v. United States, 195 U.S. 27, 55, 24 S.Ct. 769, 776 (1904).

fact he was charged with, and convicted of, a crime. The triteness of the aphorism that hard cases make bad law does not destroy its truthfulness.

No one on this court disagrees with the holding of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), that there has been a denial of equal protection of the law when that law in its administration is discriminatorily directed at a particular class of people, as in *Yick Wo* on a nationality basis. The same principles would seem to be applicable irrespective of what the generic basis for differentiation might be between classes of persons. The court is in disagreement, however, in the case of the claim of an individual who asserts that he is being prosecuted because of an ulterior motive toward him on the part of the prosecutor.

This is not a situation such as the defense of insanity where society has determined that a person should be relieved from penal responsibility in the absence of the requisite mentality. No doubt any defense makes the prosecutor's task more onerous than attendance in court on a guilty plea. I do not urge any rationale of protecting the prosecutor from the full performance of his duty of prosecuting the guilty. I do recognize, and urge, however, the necessity for not curtailing prosecutorial selectivity in the discharge of that duty. In the nature of human affairs not everyone who has committed a crime will be prosecuted, but as Judge Cummings has pointed out, there is merit in a "sensible enforcement scheme of securing general compliance through prosecution of those who defiantly violate the law in the public eye."

To subject the prosecutor's determination to the scrutiny of propriety of the motivation toward the defendant qua individual is indeed to pry the lid from the mythological cask. A few examples will suffice: "I was picked out for prosecution because I am too poor to hire an attorney and although many other people have smoked pot, they are not charged because they are wealthy and can afford top-notch lawyers, who can beat the rap; I was singled out for prosecution because my name is ethnically unorthodox in this community; I got charged because the prosecutor disliked my father, so he grants the other guy immunity to pin the rap on me; and the tax people have never prosecuted for that sort of a thing but they're after me because they think I got by too easily as to years on which the statute has run."

I do not purport to conceive all of the ways in which improper motivation might be discovered by ingenious defense counsel. I merely point out that the road is there and it will be utilized. No doubt many will be summarily dismissed as frivolous but the dismissal will itself be another ground for appeal plus the fact that those not dismissed summarily will entail the prosecutor being put to the proof of purity of motivation.

In sum, I do not believe society needs this additional remedy for the guilty. Those who are innocent will not need it. I therefore respectfully dissent.

