UNITED STATES of America, Plaintiff,

v.

John J. HAGGERTY, John S. Hynd, II, Terry L. Maxton, and Gary Shields, Defendants.

Nos. 81–CR–138 to 81–CR–141.

United States District Court, D. Colorado.

Dec. 22, 1981.

Carole Dominguin, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Daniel J. Sears, James A. Jablonski, Stephen C. Rench, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This is a criminal prosecution for violation of 5 U.S.C. § 7311(3) and 18 U.S.C. § 1918(3), which prohibits United States government employees from participating in a strike against the government.[1] The defendants are all former air traffic controllers who were presidents of their local Professional Air Traffic Controllers (PATCO) union chapters. On August 3, 1981, after seven months of highly publicized unsuccessful negotiations with the Department of Transportation, the defendants, among approximately 13,000 PATCO members nationally and 700 locally, failed to report to work. On August 4, the defendants Haggerty and Shields were held in contempt of court by Chief Judge Winner for violating a court order prohibiting strike activities. Haggerty and Shields were eventually sentenced to 18 months

probation conditioned on 200 hours of community service. On August 19, 1981, the grand jury returned indictments against all four defendants charging them with participating in a strike in violation of 18 U.S.C. § 1918.

This case is now before the court on the defendant's motions to dismiss the criminal complaints and indictments, pursuant to F.R.Crim.P. 12(b)(1) and (2), on the grounds that: 1) §§ 7311(3) and 1918 do not criminalize striking as a matter of statutory construction; 2) §§ 7311(3) and 1918(3) are void for vagueness; 3) the defendants are being selectively prosecuted due to the exercise of their constitutionally protected rights and; 4) the defendants, Haggerty and Shields, are being twice placed in jeopardy for the same offense.

For the reasons expressed in this opinion, the defendants' motions to dismiss are granted on selective prosecution and double jeopardy grounds.

## I. STATUTORY CONSTRUCTION

The defendants first claim that as a matter of statutory construction 5 U.S.C. § 7311(3) and 18 U.S.C. § 1918(3) do not prohibit or penalize striking but merely state a condition of employment; if federal workers strike they may not accept or hold positions in the federal government. The defendants note that there has never been a prosecution under § 1918 and that nothing in the legislative history of §§ 7311 and 1918 explicitly indicates that these statutes prohibit or penalize striking. While this argument is clever, a common sense interpretation of these statutes supports a contrary conclusion.

The statute under which this prosecution is brought, 18 U.S.C. § 1918, is quite plainly a criminal statute. The statute is included

---

1. 5 U.S.C. § 7311 provides that:

"an individual may not accept or hold a position in the government of the United States ... if he—...

(3) participates in a strike or asserts the right to strike against the government of the United States...."

18 U.S.C. § 1918 provides that:

"whoever violates the provision of section 7311 of title 5 that an individual may not accept or hold a position in the government of the United States if he—...

(3) participates in a strike or asserts the right to strike against the government of the United States ... shall be fined not more than $1,000 or imprisoned not more than one year and a day, or both."

in Title 18 of the United States Code which is entitled "Crimes and Criminal Procedure." The penalties for violation of the statute are criminal penalties, including imprisonment for as much as one year and one day,[2] or a fine of $1,000 or both, Title 18 is concerned only with crimes, the prosecution of crimes, the administration of criminal justice and the disposition of criminal cases. Section 1918 is included in Chapter 93 which contains 23 separate sections, each of which defines a crime relating to the acts of public officers and employees. Title 18 does not concern itself with the administrative framework of the government and government agencies, with conditions of employment or with the rights, privileges and obligations of civil servants.

It is extremely unlikely that congress, either intentionally or inadvertently, chose to insert a civil statute defining conditions of employment in the center of the federal criminal code.[3] It is similarly implausible that congress intended, through § 1918, to criminalize a condition of employment expressed in § 7311. If congress merely intended to state a condition of employment through §§ 7311 and 1918 then terminating that employment would be the only necessary remedy for the government if employees disregarded those conditions. It abuses logic to assume that congress intended to provide criminal penalties against striking workers simply for holding a position in the government when terminating employment would be easier and more appropriate.

In addition, while there are no reported prosecutions under § 1918, several courts in passing on this provision have suggested that § 1918 is a penal provision prohibiting striking against the government. *See e.g., Air Traffic Association of America v. P.A.T.C.O.*, 516 F.Supp. 1108, 1110 (E.D.N.Y.1981) ("strikes by federal employees continue to be illegal, 5 U.S.C. § 7311 and indeed criminal 18 U.S.C. [ ] § 1918"); *United States v. P.A.T.C.O.*, 504 F.Supp. 432, 440 (N.D.Ill.

1980) *rev'd on other grounds* 653 F.2d 1134 (7th Cir. 1981) ("[I]t is absolutely clear that a federal employee who strikes ... may be prosecuted under 18 U.S.C. § 1918"); *Air Transport Association of America v. P.A.T.C.O.*, 453 F.Supp. 1287, 1293 n.8 (E.D.N.Y. 1978) *aff'd* 594 F.2d 851 (2d Cir. 1978), *cert. denied* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979) ("It is also the sworn duty of the Attorney General to enforce these laws [§§ 7311, 1918] but for reasons not fathomable by this court they have apparently yet to initiate any investigations or enforcement proceedings"); *Air Transport Association v. P.A.T.C.O.*, 313 F.Supp. 181, 185 (E.D.N.Y.1970) *vacated in part on other grounds sub nom United States v. P.A.T.C.O.*, 438 F.2d 79 (2d Cir. 1970), *cert. denied* 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971) ("The federal law makes it a crime for a government employee to participate in a strike ...."); *see also* 23 A.L.R.Fed. 619, § 7 (1975) for a discussion of cases not involving air controllers, which refer to a strike as a crime under § 1918 while applying § 7311.

Accordingly, I hold that 18 U.S.C. § 1918 is a penal provision prohibiting striking by federal employees.

## II. VAGUENESS

■ The defendants next claim that the phrase "accept or hold a position," included in §§ 7311(3) and 1918(3) is unconstitutionally void for vagueness. The defendants argue that congress' failure to define "accept" or "hold" creates several ambiguities in the statute which force individuals to speculate whether their conduct is prohibited and thereby triggers due process concerns under the Fifth Amendment. While these statutes are not exemplars of legislative artistry and draftmanship, they nonetheless give persons of ordinary intelligence fair notice that their contemplated conduct is forbidden by statute. *Bouie v. City of*

---

**2.** Congress in using the year-and-a-day term of sentence—a term which only has meaning in the context of criminal violations—obviously intended that a violation of § 1918 be classified as a felony offense.

**3.** *See* 80 Stat. 608–09 (1966), where congress explicitly added § 1918 to Title 18.

*Columbia,* 378 U.S. 347, 348, 351, 84 S.Ct. 1697, 1699, 1701, 12 L.Ed.2d 894 (1964).

Further, the instant challenge is indistinguishable from that in *United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879, 884–85 (D.D.C.1971) *aff'd mem.* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971). In *Blount,* the plaintiff sought declaratory and injunctive relief invalidating the terms "strike" and " 'participates' in a strike," of §§ 7311(3) and 1918(3), on vagueness and overbreadth grounds. In the three-judge district court decision, affirmed by the supreme court without opinion, the district court rejected the plaintiff's contention that congress' failure to further define the terms "strike" and "participates" rendered these statutes unconstitutional. The court reasoned that the term "strike" is of such common usage and acceptance that men of common intelligence need not guess at its meaning. *Id.*

In construing the term "participates," the court noted initially that federal courts have broad latitude to construe a statute in such terms as will save it from the infirmities of vagueness and overbreadth. Accordingly, the panel concluded that "it is only an actual refusal by [federal] employees to provide services that is forbidden by 5 U.S.C. § 7311(3) and criminalized by 18 U.S.C. § 1918," rather than such conduct as speech, union membership and informational picketing even though such activities may take place in concert during a strike by others. *Id.* at 884. Under the court's redeeming interpretation the statutes were neither vague nor overbroad.

This common sense interpretation of the statutes resolves any ambiguities in the terms "accepts" or "holds" a position. It is an actual refusal to provide services by federal employees—meaning employees who are holding or accepting positions in the federal government—that is forbidden by 5 U.S.C. § 7311(3) and criminalized by 18 U.S.C. § 1918.

4. To my knowledge, the PATCO cases are the first selective prosecution cases where employees are being prosecuted for employment relat-

## III. SELECTIVE PROSECUTION

The defendants' third claim is that they are being selectively prosecuted due to the exercise of their constitutionally protected union activities. The Due Process Clause of the Fifth Amendment incorporates the application of concepts of equal protection to the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed.2d 884 (1952). Accordingly, the due process clause furnishes a federal defendant with the same guarantee against discriminatory federal prosecution as when state officials attempt to enforce a valid statute in a discriminatory fashion. *United States v. Steele,* 461 F.2d 1148, 1151 (9th Cir. 1972); *United States v. Falk,* 479 F.2d 616, 618 (7th Cir. 1973). The rationale behind the prohibition against discriminatory enforcement of the penal law was stated long ago by the supreme court in *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886):

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between person in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

The mere conscious exercise of some selectivity is not in itself a constitutional violation unless the selection is based upon an unjustifiable standard such as race, religion or other arbitrary classification. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). The initial burden of establishing *prima facie,* the fact of selective prosecution lies with the defendant since the presumption is that a prosecution for violation of a criminal law is undertaken in good faith and in a nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice.[4]

ed activities and the government is both employer and prosecutor. This unique factual situation might suggest that the usual presump-

*United States v. Ojala,* 544 F.2d 940, 943 (8th Cir. 1976); *United States v. Falk, supra,* at 620. To overcome this presumption, the test developed by the circuits is that a defendant must establish *prima facie* that:

> 1) While others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and
>
> 2) The government's discriminatory selection of him has been invidious or in bad faith, *i.e.,* based upon such impermissible considerations as race, religion or the desire to prevent his exercise of constitutional rights.

*U. S. v. Berrios,* 501 F.2d 1207, 1209 (2d Cir. 1974). *See e.g., United States v. Amon,* No. 80–1856, 669 F.2d 1351 (10th Cir. 1981); *United States v. Saade,* 652 F.2d 1126, 1135 (1st Cir. 1981); *United States v. Ojala, supra; United States v. Falk, supra,* at 623. The two prongs of this test are often referred to as intentional and purposeful discrimination. *United States v. Berrios, supra.* One such impermissible consideration under the second prong of this test is the desire to retaliate against defendants for their exercise of rights protected by the First Amendment. *United States v. Falk, supra; United States v. Steele, supra.*

■ Once a defendant makes a *prima facie* showing of selective prosecution, "the burden of going forward with proof of non-discrimination" shifts to the government. *United States v. Falk, supra,* at 624; *United States v. Myers,* 635 F.2d 932, 940 (2d Cir. 1980); *United States v. Cammisano,* 546 F.2d 238, 242 (8th Cir. 1976); *United States v. Crowthers,* 456 F.2d 1074, 1978 (4th Cir. 1972).

In the instant case, the defendants claim that the government focused its prosecution on them due to the exercise of their First Amendment rights to free speech, association and to petition the government for redress of grievances, in connection with their activities as PATCO officials holding positions of authority in the union and representing the union in the negotiating and

collective bargaining process. *Cf. United Federation of Postal Workers v. Blount, supra.* The defendants further note that these rights are statutorily protected in 5 U.S.C. § 7102, which provides in pertinent part that federal employees shall have the right, "freely and without fear of penalty or reprisal," to form, join and assist labor organizations; to act for a labor organization in a representative capacity and present the views of the labor organization to heads of agencies and other officials of the executive branch of the government; and to engage in collective bargaining with respect to conditions of employment through representatives chosen by the union.

I have considered the selective prosecution argument at other stages of this prosecution. On October 13, 1981, I held that the defendants had raised a colorable claim of selective prosecution and I granted the defendants' motions for discovery on the issue, pursuant to F.R.Crim.P. 16(a)(1). *Cf. United States v. Ness,* 652 F.2d 890, 892 (9th Cir. 1981). The defendants had presented portions of the grand jury transcript in which Assistant United States Attorney Carole Dominguin stated, in response to questions by the grand jury foreman as to why only these four defendants were being prosecuted, that she was only "authorized" to prosecute those defendants.

At a hearing on the motions to dismiss on November 10, 1981, the defendants presented a teletype transmitted from the justice department to local U.S. Attorney's offices indicating that the justice department had developed a list of "prosecutive targets" under § 1918 in advance of the strike. I held that the defendants had made a threshold showing of selective prosecution and I ordered an evidentiary hearing on the issue. *See United States v. Saade, supra,* at 1135. I also suspended determination of the other points raised in the defendants' motions to dismiss until the evidentiary hearing.

tion of good faith in instituting prosecutions is

entitled to less than its ordinary weight.

■ After evaluating the testimony and evidence presented at the evidentiary hearing on December 8–9, 1981, I conclude that the defendants presented a compelling showing of selective prosecution due to the exercise of their previously enunciated First Amendment rights and the government failed to satisfy its burden of going forward with proof that its prosecution rested on anything other than invidious grounds. My findings are as follows.

■ First, there is no question that the defendants were intentionally selected for prosecution while others similarly situated were not. The government admits that it targeted the defendants for prosecution among the many air traffic controllers who would become eligible for prosecution by striking. Further, the defendants present substantial evidence which indicates that they were purposefully selected for prosecution based on the exercise of their First Amendment rights in connection with their positions as union presidents and representatives.

■ I note at the outset that the government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution. *United States v. Ojala, supra,* at 943 n.2; *see United States v. Ness, supra,* at 892 ("discriminatory investigation taints prosecution where normal procedures for selecting cases for prosecution have been bypassed") relying on *United States v. Steele, supra,* at 1151–52. The government's prosecutorial measures in the instant case can only be characterized as abnormal. The evidence indicates that the defendants were selected for prosecution even before they had engaged in any illegal activity—a tactic which the head of the criminal division at the Colorado United States Attorney's office quite candidly admitted was contrary to normal procedures.

Justice department officials indicated that they discussed the selection of "prosecutive targets" under § 1918 as early as February, 1981. Not only had the defendants failed to commit any criminal acts at that point but the PATCO contract was not scheduled to expire until the middle· of March, 1981. Accordingly, the government commenced its prosecutorial selection process at a time when it was supposed to be engaged in good faith bargaining over a new contract with PATCO union representatives. It is not surprising that the list of targets eventually developed and implemented, after a failure to reach an accord, contained the names of many, and in Colorado only, top level union representatives.

In June, 1981, the government took additional measures to develop its targeting process in anticipation of a June 23, 1981 strike. On June 16, the justice department transmitted a teletype to 19 local United States Attorney's offices, including the district of Colorado, placing these offices in a state of preparedness for initiating prosecutions under § 1918. · The teletype specifically stated that the justice department would "identify appropriate prosecutive targets under section 1918 . . . and notify appropriate offices."

On June 21, 1981, an Assistant United States Attorney in the civil division in Colorado, R. J. Brumbaugh, received a list of "targets" by telephone from the justice department without any restrictions against use in criminal prosecutions. Brumbaugh indicated that the individuals whose names were communicated to him were identified as union leaders. This list specifically included the names of the defendants Haggerty and Maxton. Brumbaugh also noted that this list did not correspond to union lists that he was aware of and he called an attorney in the Federal Aviation Administration who provided him with a list of union officials.

This second list contained the names of all four defendants and was essentially identical to the list which the criminal division relied on to target individuals for prosecution. The head of the criminal division at the Colorado United States Attorney's Office, Robert McAllister, attached this list to a· teletype he received from the justice department on August 2, 1981. The justice department transmitted this teletype to McAllister and to the heads of criminal

divisions in other districts in anticipation of the August 3, 1981 strike. The teletype stated that persons in those districts were potential targets of § 1918 prosecutions and that local offices should develop cases against the targets in the event of a strike on August 3. The teletype also stated that the names of the targets were being provided to the F.B.I. field offices in those districts. McAllister indicated that the target list attached to that teletype contained the names of the individuals that he was instructed to develop cases against under § 1918.

The local Assistant United States Attorney assigned to this case, Carole Dominguin, also indicated that she was authorized by Washington to prosecute these defendants. Ms. Dominguin's comments before the grand jury are particularly revealing. The dialogue between Assistant United States Attorney Dominguin and the grand jury foreman is as follows:

> "THE FOREMAN: The question I had, Carol, is . . . why only these four individuals when there were several other people who were on strike? Why were these four selected?
>
> MS. DOMINGUIN: Well, that's very difficult for me to answer because I don't know the answer. I do know that we received a teletype from Washington, D.C. that had the list of either *presidents of the local unions* or some other means of selecting them was used. *We have authorization to present these to you and we have not received authorization for others.*
>
> THE FOREMAN: So they told you specifically which individuals to—
>
> MS. DOMINGUIN: *Yes,* and I can only assume that they have a list, *a national list of all the presidents* and members of the Professional Air Traffic Controllers Organization throughout the country and then perhaps targeted a few for the purposes of prosecution. . . . " [Emphasis supplied.] (G.J.Tr. 2–3.)

While the precise sequence and manner of transmission of these target lists is not entirely clear, I find that the justice department intended to and did communicate a list of prosecutable targets to the Colorado United States Attorney's office in advance of the strike and the targets included each of the defendants. The justice department also removed the traditional local discretion of the United States Attorney's office which was apparently directed to proceed only against the pre-selected targets. Local Assistant United States Attorneys and a local F.B.I. agent also indicated that the justice department was applying substantial pressure on them to develop cases and file criminal complaints against the targeted individuals.

■ As a result of its extraordinary prosecutorial measures of both targeting select individuals in advance of any criminal activity and removing the prosecutorial discretion of the local United States Attorney's office, the government placed itself in a situation where it retained greater control over both the prosecutorial and negotiating processes. Testimony showed that the justice department sought and actually received the names of the specific targets from the Federal Aviation Administration, which had been in the process of negotiating with union representatives. The selection of targets under these circumstances, culminating in an ultimate hit list containing many top level union representatives, is instinct with invidious motivations.[5]

■ Further, the defendants presented several pieces of documentary evidence which strongly suggest that the government focused on them due to their union representative status and activities. Some of the target lists developed by the justice department and located in the Colorado United States Attorney's office, contained designations such as "rep" next to the names of some of the defendants. Other lists specifically referred to individuals, including the defendants, as presidents of their local PATCO chapters. I find that the evidence established a compelling *prima facie* case of selective prosecution.

---

5. *Cf.* (Cardozo, J.) *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917).

The government's explanation for its prosecutorial selection of only the defendant-union presidents was that it desired targeting individuals whom it considered the "most culpable." According to justice department officials, the department considered the "strike leaders" to be the most culpable and it structured its selection process to target those individuals. The justice department, in discussions with the Federal Aviation Administration, further defined the culpable strike leaders that it desired to target as "choirboys" or as part of a "cluster" concept. The "choirboys" or "clusters" were a coercive element that pressured recalcitrant air traffic controllers into adopting a hardline strike position.

However, the government has not come forward with one shred of evidence indicating that the named defendants were strike leaders, choirboys or part of any cluster concept. Further, the government failed to present any evidence indicating that the justice department developed or even considered developing guidelines or procedures for determining which air traffic controllers were coercive strike leaders. The Federal Aviation Administration apparently provided the specific names of the targets to the justice department but there is no evidence that the justice department provided the F.A.A. with any guidelines for selecting these coercive leaders, or that the F.A.A. developed any such procedures on its own. Nor did the government come forward with

evidence of any other basis by which it targeted the defendants.[6]

In summary, after reviewing all of the evidence presented before me and evaluating the credibility of the testimony I find that the justice department, in conjunction with the F.A.A. developed a list of targets, which included the defendants, in advance of the strike and without any investigations, guidelines or other indicia of an objective to target coercive strike leaders. These measures represented a departure from normal prosecutorial procedures. The justice department communicated a list of these targets orally and through written teletypes to the Colorado United States Attorney's Office, often referring to the defendants by their union representative status and positions. The Colorado United States Attorney's Office carried out the justice department's instructions to develop cases against these targeted union presidents, among the many similarly situated air traffic controllers.

Accordingly, I conclude that the defendants were selectively prosecuted on the basis of their protected activities in connection with their positions as union presidents and representatives.

## IV. DOUBLE JEOPARDY

The defendants' Haggerty and Shields final claim is that this prosecution is barred by the double jeopardy clause. The Double

---

**6.** The government claims that the justice department's national prosecutorial efforts did not predominantly target union presidents, as in Colorado, and therefore the defendants' claims of selective prosecution on the basis of First Amendment protected union representative activities must fail. I note that I only have jurisdiction to determine whether the government's targeting process, as implemented in the District of Colorado, constituted discriminatory prosecution. However, this case is not an isolated prosecution; defendant-union officials have raised claims of selective prosecution in federal courts in several other districts, on the basis that they were targeted due to their protected union representative activities. *See e.g., United States v. McDonald*, CR–H–81–132, (S.D.Tex.) (PATCO Local President); *United States v. Amato and Maimone*, 81–CR–487, (E.D.N.Y.) (PATCO Local Presidents); *United States v. Butterworth, et al.*, 81–CR–0335–SAW (N.D.Cal.) (PATCO Local Presidents and

officials); *United States v. Galloway*, Crim. No. 81–000192A (E.D.Va.) (PATCO Local President); *United States v. Phillips, et al.*, 81–C–4371 (N.D.Ill.) (7 PATCO Officials); *United States v. Paisely*, CR–81–196–PHX–CLH (D.Ariz.) (PATCO Local President).

In *United States v. Paisely, supra,* (D.Ariz., Nov. 12, 1981), Judge Hardy granted the defendant's motion to dismiss on selective prosecution grounds after an evidentiary hearing. The District Judge found that the government's decision to prosecute only PATCO local president Paisely, among several similarly situated Phoenix air traffic controllers, "was based on impermissible grounds; namely the exercise by Mr. Paisely of the constitutional right to belong to a union and to hold office in that union." Judge Hardy also found that the government failed to go forward with evidence that the defendant was a strike leader or that any other reasonable basis for prosecuting only Paisely existed.

Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." This constitutional provision is a guarantee "that the [government] with all its resources and power [shall] not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and "compelling him to live in a continuing state of anxiety and insecurity...." *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

■ The constitutional prohibition against double jeopardy consists of three separate guarantees: "(1) It protects against a second prosecution for the same offense after acquittal. [(2)] It protects against a second prosecution for the same offense after conviction. [(3)] And it protects against multiple punishments for the same offense." *Illinois v. Vitale*, 447 U.S. 410, 415, 100 S.Ct. 2260, 2264, 65 L.Ed.2d 228 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2074, 23 L.Ed.2d 656 (1969). Since the defendants Haggerty and Shields assert that their former contempt convictions bar this prosecution under 18 U.S.C. § 1918(3), I am only concerned with the second of these guarantees in the instant case.

The defendants articulate a two-step argument on this point; First, they claim that the contempt sanctions imposed by Chief Judge Winner were criminal rather than civil. Second, they argue that these criminal contempt convictions are convictions for the "same offense" as the current prosecution for violation of § 1918(3), thereby barring this second prosecution under the double jeopardy clause.

■ As to the defendants' first point: while the court initially characterized the proceedings as civil, "the mere caption of the cause does not change the nature and purpose of the contempt." *In Re Fox*, 96 F.2d 23, 25 (3d Cir. 1938). This court has the power to look to the surrounding circumstances to determine the nature of the contempt adjudication. *United*

*States v. Hughey*, 571 F.2d 111, 115 (2d Cir. 1978). If the objective of awarding relief is to compel compliance with a court order or to compensate for refusal, the contempt proceeding is civil in nature; but if the purpose is to punish the respondent and vindicate the court, the proceeding is criminal. *Gompers v. Bucks Stove and Range Co.*, 221 U.S. 418, 441-42, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911); *United States v. Asay*, 614 F.2d 655, 659 (9th Cir. 1980); *United States v. Hughey, supra.*

■ Consistent with the objectives underlying civil and criminal contempts, if the sentence imposed is conditional and grants the defendant the ability to end the penalty by complying with the order, the contempt is civil, *Colombo v. New York*, 405 U.S. 9, 10-11, 92 S.Ct. 756, 757, 30 L.Ed.2d 762 (1972); *Shillitani v. United States*, 384 U.S. 364, 369-70, 86 S.Ct. 1531, 1534-1535, 16 L.Ed.2d 622 (1966); *Cheff v. Schnackenberg*, 384 U.S. 373, 377, 86 S.Ct. 1523, 1524, 16 L.Ed.2d 629 (1966); where the penalty is fixed and there is no possibility of complying with the court order, the contempt is criminal. *Id.*

■ In the instant case there is no question that the contempt was criminal. Chief Judge Winner sentenced Haggerty and Shields on August 28, 1981, some 23 days after the government fired all of the striking air traffic controllers. Accordingly, the government made it "impossible for the defendants to return to work and purge themselves of the contempt even if they had so desired." *United States v. P.A.T.C.O.*, 525 F.Supp. 820 (E.D.Mich., Nov. 3, 1981). The only possible purpose of contempt sanctions imposed after the August 5, 1981 firings was to punish the defendants with fixed criminal penalties.

Given that the defendants have been convicted and sentenced based on their acts of striking in violation of a court order, they argue that a subsequent prosecution for striking against the government, pursuant to 18 U.S.C. § 1918(3), is a prosecution for the "same offense" as that punished in the contempt proceeding and is therefore barred by the double jeopardy clause. The

government relies on *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), for the proposition that this second prosecution is not barred since the criminal contempt statute, 18 U.S.C. § 401(3), and the anti-strike statute, 18 U.S.C. § 1918(3), have different elements and require different proof. However, the *Brown* decision actually provides two alternative grounds for granting the defendants' motions to dismiss.

In *Brown*, the supreme court stated:

The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . .'

Id. at 166, 97 S.Ct. at 2225. The court then applied the *Blockburger* test, holding that a lesser included and greater offense, (joyriding and auto theft), constitute the same offense under the double jeopardy clause because "it is clearly not the case that each statute requires proof of facts that the other does not." *Id.* at 168, 97 S.Ct. at 2226.

▮ In the instant case, the § 1918(3) felony prosecution is barred by the double jeopardy clause pursuant to *Brown v. Ohio, supra*, because, ironically, it is essentially a prosecution for a lesser included offense and does not require proof of any facts beyond that proven in the criminal contempt misdemeanor prosecution.

The court order which formed the basis of the contempt proceeding prohibited the strike activities which are the subject of this second prosecution. The government's complaint and memorandum in support of the temporary restraining order, filed on

August 3, 1981, specifically stated that the defendants Haggerty and Shields were employees of the Federal Aviation Administration who had executed affidavits that they would not violate 5 U.S.C. § 7311, and that they actually engaged in a strike against the United States, in violation of § 7311, on August 3, 1981. The government also stated that the strike action violated 18 U.S.C. § 1918.

Accordingly, Chief Judge Winner's temporary restraining order, entered on August 3, 1981, properly reflected the language of these statutes and stated in pertinent part that P.A.T.C.O. and P.A.T.C.O. locals and their officers, agents, individual defendants, and all other Federal Aviation Administration employees are restrained from engaging or taking part in any strike, work stoppage, slowdown or other concerted failure to report to work.[7] At the contempt proceeding on August 4, 1981, the bulk of the government's evidence was directed to proving that the defendants and others had not worked and thereby violated the temporary restraining order. Based on the evidence, Chief Judge Winner held the individual defendants and three P.A.T.C.O. locals in contempt of court. In addition, he fined the three locals (# 431, 516 and 501), $1,000, $5,000 and $10,000 respectively for each day that the "strike" continued although he suspended sentencing on the individual defendants. At the sentencing of Haggerty and Shields on August 28, 1981, Chief Judge Winner remarked at length that these defendants had no right to strike against the government and that doing so was a violation of law.

At the criminal contempt proceeding the government proved that the defendants violated the temporary restraining order which included all of the elements of 18 U.S.C. § 1918(3)—that the defendants not go on strike while holding a position in the federal government. The only additional element that the government had to prove in the

---

**7.** Strike is defined in § 501(2) of the Taft-Hartley Act, 29 U.S.C. § 142, to include any strike by employees . . . and any concerted slowdown or other concerted interruption of operations by employees.

contempt proceeding was a willful violation of the order. The government need not prove any additional facts in this latter prosecution. Since it is not the case that "*each* statute requires proof of a fact that the other does not" this second prosecution is barred by the double jeopardy clause pursuant to *Brown v. Ohio,*[8] *supra.*

The supreme court's most recent interpretation of the "same offense" provision of the double jeopardy clause provides additional support for the defendants' position. In *Illinois v. Vitale, supra*, the Supreme Court of the United States vacated a holding by the Illinois Supreme Court, that the crimes of failing to reduce speed to avoid an accident and manslaughter by auto were the same offense, due to its uncertainty as to the proof involved in prosecutions for these offenses. The Illinois Supreme Court held that the misdemeanor of failing to reduce speed was a lesser included offense of involuntary manslaughter by auto and therefore successive prosecutions for these two crimes were barred by the double jeopardy clause pursuant to *Brown v. Ohio, supra*. The Illinois Supreme Court had reasoned that the lesser offense of failing to reduce speed required no proof beyond that necessary for conviction for the greater offense of involuntary manslaughter.

On certiorari, Justice White for a majority of the court held that the double jeopardy clause would not prohibit the manslaughter prosecution provided that the state could prove manslaughter without relying on the ingredients of the traffic offense. *Id.* 447 U.S. at 419, 100 S.Ct. at 2266. The court noted that the mere possibility that the state would seek to rely on the elements of the traffic offense to establish manslaughter is not sufficient to bar the latter prosecution. However, if the careless failure to reduce speed is always an element of manslaughter by auto, as a matter of state law, *or* if the state actually relies on and proves a failure to reduce speed as the

reckless act necessary to establish manslaughter, then the defendant would have a substantial claim of double jeopardy under the Fifth Amendment. *Id.* at 419-21, 100 S.Ct. at 2266-2268.

In the instant case, there is no uncertainty as to proof; the government has already relied on and proven the elements of the lesser offense—§ 1918(3), striking against the government—in order to establish the technically greater offense of criminal contempt of a court order prohibiting strike activities. Accordingly, this latter prosecution under § 1918(3) is barred by the double jeopardy clause.

Further, in *Brown v. Ohio, supra*, the court stated that "the *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires relitigation of factual issues already resolved by the first." *Id.*, 432 U.S. at 166-67 n.6, 97 S.Ct. at 2226 n.6. The court noted that in *In Re Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889), it held that a conviction of a Mormon on a charge of cohabiting with his two wives over a two and one-half year period barred a subsequent prosecution for adultery with one of them on the day following the end of that period. The court stated:

In *Nielsen*, conviction for adultery required proof that the defendant had sexual intercourse with one woman while married to another; conviction for cohabitation required proof that the defendant lived with more than one woman at the same time. Nonetheless, the court ... held the separate offenses to be the 'same' for the purposes of protecting the accused from having to " 'run the gauntlet' a second time." [Citations omitted.]

**8.** It is well established in the Tenth Circuit that "if the same evidence would sustain a conviction of the second offense, the double jeopardy clause bars prosecution of the second offense," *Wilkett v. United States*, 655 F.2d 1007 (10th Cir., 1981); *see Aiuppa v. United States*, 393 F.2d 597, 599 (10th Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *Waters v. United States*, 328 F.2d 739, 741 (10th Cir. 1964).

*Id.* Because the court in *Brown* concluded that a lesser included offense and a greater offense were the "same" under the *Blockburger* test, it stated that it "need not decide the issue whether the repetition of proof required by successive prosecutions "against Brown would otherwise entitle him to the additional protection offered by . . . *Nielsen.*" *Id.* In the instant case, this repetition of proof factor recognized in *Brown* and *Nielsen* provides an alternative ground for barring this prosecution due to double jeopardy.[9] *See also United States v. Combs,* 634 F.2d 1295, 1296–97 (10th Cir. 1980) ("offenses may be the same for constitutional purposes although they are not technically greater and lesser included offenses" citing *Brown v. Ohio, supra,* at n.6), 97 S.Ct. at n.6.

Finally, to my knowledge, every court which has addressed the issue has held that where a court order which forms the basis for a criminal contempt conviction includes a prohibition against committing a substantive offense, successive prosecutions for both criminal contempt and for the substantive offense violate the double jeopardy clause. The leading case is *United States v. United States Gypsum Co.,* 404 F.Supp. 619 (D.D.C.1975). In *United States Gypsum,* a criminal contempt proceeding was instituted to punish the respondents for violation of a court order based on the same price-fixing activities which were the subject of previous convictions under the Sherman Anti-Trust Act. The district court rejected the double jeopardy approach that focuses on a technical comparison of the elements of the statutes, rather than on the overwhelming similarities of proof in the respective proceedings, and it barred the second

prosecution. The court noted that the same factual issues would be tried in the second prosecution and that even though violation of the contempt statute, 18 U.S.C. § 401(3), required proof of an additional element of a willful violation of a court order, it was not "sufficiently material or substantial to supercede (sic) the considerations of fairness or finality which form the basis of the double jeopardy bar." *Id.* at 623.

The district court, relying on *United States v. Rollerson,* 449 F.2d 1000, 1004 (D.C.Cir.1971), distinguished cases involving summary contempt sentences, where courts had declined to impose a double jeopardy bar to later prosecutions based on the same conduct, reasoning that an important consideration underlying the double jeopardy clause is to protect a defendant from the harassment of successive trial proceedings. Since summary contempt sanctions are imposed summarily, in the absence of formal proceedings, the defendant does not suffer the harassment of separate trials. *United States v. Rollerson, supra,* at *id.; United States v. United States Gypsum Co., supra,* at 619. *See also People v. Gray,* 36 Ill. App.3d 720, 344 N.E.2d 683, 688 (1st Dist. 1976).

Similarly, in *People v. Gray,* 69 Ill.2d 44, 12 Ill.Dec. 886, 370 N.E.2d 797 (1977), *cert. denied sub nom., Illinois v. Gray,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), the trial court issued a protective order enjoining the defendant from striking, molesting or hitting his wife. He subsequently struck her with a gun and shot her. He was held in contempt and sentenced to serve six months in Cook County Jail. Thereafter, he was indicted for aggravated

---

9. In addition to the two double jeopardy approaches discussed by the majority in *Brown,* two justices expressed a third approach which would bar the prosecution in the instant case. Justices Brennan and Marshall adhere to the view that, except in a few limited circumstances, the double jeopardy clause requires that "all charges against a defendant growing out of a single criminal act, occurrence, episode or transaction" must be tried in a single proceeding. *Id.* (Brennan, J. concurring at 170, 97 S.Ct. at 2228.) *See also Thompson v. Oklahoma,* 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977), (Brennan, J. dissenting from a denial of

certiorari) and cases collected therein. These justices reason that "this 'same transaction' test of 'same offenses' not only enforces the ancient prohibition against vexatious multiple prosecutions embodied in the Double Jeopardy Clause, but responds as well to the increasingly widespread recognition that the consolidation in one lawsuit, of all issues arising out of a single transaction or occurrence best promotes justice, economy and convenience." *Ashe v. Swenson,* 397 U.S. 436, 453–54, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (Brennan, J. concurring).

battery and attempted murder based on this same conduct which was the subject of the contempt conviction. The Illinois Supreme Court held that these latter prosecutions were barred by the double jeopardy clause. *See also People v. Holmes,* 54 Ill. App.3d 843, 11 Ill.Dec. 498, 368 N.E.2d 1106 (3d Dist. 1977).

For the reasons expressed in this opinion it is hereby

ORDERED that the defendants' motions to dismiss are granted. Defendants are discharged and released from the obligations and conditions of their bonds.