**UNITED STATES of America**

v.

**Paul AMATO and Anthony J. Maimone, Defendants.**

**No. 81 CR 487.**

United States District Court, E. D. New York.

March 5, 1982.

E. R. Korman, U. S. Atty., E. D. N. Y. by Ruth Nordenbrook, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Arnold D. Roseman, New York City, for defendant Amato.

Howard A. Jones, White Plains, N. Y., for defendant Maimone.

PLATT, District Judge.

Paul Amato and Anthony Maimone are individually charged in separate counts of a two count indictment with participating in a strike against the government of the United States at a time when each held a position of employment as an air traffic control specialist with the Federal Aviation Administration in violation of 5 U.S.C. § 7311 and 18 U.S.C. § 1918(3).

Defendants move pursuant to Rule 12 of the Federal Rules of Criminal Procedure to dismiss the indictment against them on the grounds that:

(1) the defendants are being selectively prosecuted and are being discriminated against;

(2) the crime charged in the indictment is not the crime that is defined in the pertinent statutes;

(3) the pertinent statutes are unconstitutionally vague and indefinite;

(4) the pertinent statutes should be amended;

(5) the Department of Justice has violated its own administrative rules and policy;

(6) the defendants have been granted amnesty by the President of the United States;

(7) the indictments should be dismissed in the interests of justice.

I

Following submission of their initial briefs and oral argument on the motions, we agreed that as regards defendants' claims of selective prosecution, they had made sufficient allegations of a purposeful invidious discrimination to entitle them to an evidentiary hearing. *See United States v. Saade*, 652 F.2d 1126, 1135 (1st Cir. 1981); *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973); *United States v. Phillips*, 525 F.Supp. 1, 2 (N.D.Ill.1981).

The parties agreed to delay any determination as to grounds (2)–(7) pending the hearing and resolution of the selective prosecution question.

The hearing, commenced on January 15 and concluded on January 25, 1982, consisted of the testimony of eleven witnesses called by the defendants and the presentation of video tapes by the Government.

■ Our analysis and findings are circumscribed by the two-pronged test of "intentional and purposeful discrimination" set forth by the Court of Appeals for this Circuit in *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974):

> "To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as 'intentional and purposeful discrimination.'

We note at the outset that the defendants have easily met their burden as to the first part of the *Berrios* test. There is not, nor has there ever been any dispute in this Court about the fact that approximately 13,000 air traffic controllers and members of the Professional Air Traffic Controllers Organization ("PATCO") engaged in a strike against the government and that only 78 prosecutions were authorized by the

Department of Justice ("the Department"). (Tr. 268–73). For all practical purposes, defendants' "heavy burden" has been to show the invidious nature of the prosecution. And it is this burden which they have failed to carry.

Defendants' allegations[1] essentially are that they were selected for prosecution because of their positions as a present president of PATCO Local 160 (Paul Amato) and a past president of that same Local (Anthony Maimone). The prosecutions were allegedly designed to inhibit, suppress and punish them for their active exercise of their First Amendment rights to speak and associate freely.

The evidence adduced as to these allegations gives rise to two possible levels of analysis. The first is directed to the policy formulated by the Department of Justice in conjunction with Federal Aviation Administration ("FAA") officials and specifically, the criteria used to determine which individuals could be targeted fairly for prosecution. The second possible analysis focuses upon the implementation of the targeting policy in this judicial district.

Neither the Government nor the defendants have been able to suggest which level of analysis is required and our reading of the cases does not present any clear cut answer. Thus, we shall address both levels.

*The National Policy*

■ The Department of Justice's national policy regarding the targeting of individuals for prosecution under 18 U.S.C. § 1918 was directed toward "strike leaders", otherwise identified as "coordinators", "cluster leaders", and "choir boys". (Tr. 24–25, 42–45, 174, 236–37).[2] The Depart-

---

**1.** Defendant Amato also alleges that their selection was impermissibly based upon their ethnic origin. (Brief for Def. Paul Amato 16, 21). This allegation remains unsupported and was not pursued by defendants during the six days of the hearing.

**2.** The following excerpts illustrate the definitions of the terms used by those government officials who had input in formulating the government's targeting policy:

THE WITNESS: There are three categories as explained to me by Dolph Sand and Bert Randall. We had a meeting on or about June 18th. There were cluster leaders.
THE COURT: What is a cluster leader?
THE WITNESS: Okay. As explained to me, the facilities were organized in clusters. Okay. You might have a number of facilities, a number of powers in a cluster. Supposedly a cluster leader was the person who

ment admitted the obvious impracticability and difficulties in attempting to prosecute all of the controllers who it believed had engaged in the strike. (Tr. 235–36).[3] There was testimony that in seeking a neutral basis (Tr. 30, 145, 173–74), several factors, including job function, were considered and rejected. (Tr. 171–72, 184, 323–25). Ultimately the Department determined that strike leadership was the most appropriate criterion. (Tr. 42–45, 236, 324–25). Not only would the prosecution of such persons have a deterrent effect, a factor which does not in itself constitute invidious discrimination, *United States v. Ness*, 652 F.2d 890, 892 (9th Cir. 1981); *United States v. Johnson*, 577 F.2d 1304, 1309 (5th Cir. 1978), but, the more public, vocal, aggressive or assertive a role that a strike leader by definition would play in the strike itself would simplify the gathering of evidence of participation in a strike as re-

quired by 18 U.S.C. § 1918. *See United States v. Heilman*, 614 F.2d 1133, 1138–39 (7th Cir.), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3014, 65 L.Ed.2d 1114 (1980); *United States v. Warinner*, 607 F.2d 210, 214 (8th Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980).

Despite days of testimony, no evidence was produced that would support a finding that the Department of Justice's policy was designed to target PATCO leaders, officers or officials. Clearly, those Justice Department officials responsible for formulating the policy recognized that the same persons designated as strike leaders in any given case might also be PATCO functionaries. (Tr. 45, 238, 265). But no one was to be *included or excluded* on that basis. Indeed in this judicial district, nine persons were originally targeted as "strike leaders." (Defs' Ex. F). Of these, five were serving

---

held (sic) [headed] up the strike organized in that cluster.

THE COURT: All right. Then [he is] the most responsible [, who] is the second one.

THE WITNESS: Okay. The second category, as I understand it, was strike coordinators. They were apparently the intermediates, as I understood it, between the choir boys, the lowest category—

THE COURT: What were the choir boys?

THE WITNESS: The choir boys, as I understood it, essentially were the Sergeants. They were responsible on the personnel level for trying to get the air traffic controllers out in the event there was a strike.

Tr. 24–25 (Testimony of David Kline).

Q Did you and Mr. Kline work out between you a definition of the term "strike leader?"

A Not a—not any specific definition, no. We discussed some of the types of people that would fall within the term "strike leader."

Q Those definitions included what, sir?

A Well, one term that I used to him repeatedly was the term "arm twisters," people that were active in persuading and rather vigorously persuading fence sitting Air Traffic Controllers to go out on strike. Other terms utilized at that time were terms of "choir boys," various terms that had been provided to us by FAA, of a—of the organization of a strike organization, a strike structure.

Tr. 230 (Testimony of James Reynolds)

Q Do you remember what those criteria were?

A To my memory, they wanted to have strike leaders, strike coordinators, choir boys, cluster leaders, whatever information— you see, we gave them those names. The Department of Justice had no knowledge of PATCO strike organization. We had copies of PATCO strike plans, which they had widely disseminated.

In our reading of those strike plans, over the nine months prior to the strike, we were able to understand some of PATCO terms and, therefore, strike leaders or cluster leaders or choir boys or coordinators were all words that PATCO used in their publication. So, therefore, we focused on those words and the Department of Justice in turn told us to supply them with the names attached to those words.

Q A strike leader meant to you a person who was an arm twister or one who coerces others into striking? Is that what you understood?

A It could have meant that among other things, yes, sir. There wasn't necessarily physical arm twisting involved, but it was the people who were responsible for organizing the strike itself and the structure of the strike itself.

Tr. 310 (Testimony of Dolph Sand)

**3.** The Government's decision to prosecute only some of the strikers is not in itself constitutionally impermissible. *Oyler v. Boyles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

in some official capacity with PATCO Locals while four were not.

Nationally, more than 100 persons were originally targeted for investigation (including the above nine). (Defs' Ex. F). Seventy-two complaints were originally authorized. Thirty-one of those seventy-two persons were clearly identified as present PATCO Local officials; although four others were identified as possible officials. (Tr. 272–74).

In addition, once targeted, the Department of Justice policy did not hamstring the local prosecuting United States Attorney offices. The United States Attorneys were free to develop cases based upon independent investigations of strike leaders not originally targeted. (Tr. 268–70, 280–82, 499–501, 510–511).

It is not at all certain whether the Department ever expected that all targeted individuals would be indicted. Nonetheless, at the time that the targeted names were sent to local Federal Bureau of Investigation and local United States Attorney offices with instructions as to how to proceed in investigating these cases (Defs' Ex. F, H), they did not include any direction to focus on or in any way concentrate on securing evidence first and foremost against those targeted individuals who may also have been officials in the PATCO organization. The instructions made no such distinction, calling for even-handed investigation of all targeted individuals. (*See* Defs' Ex. H).[4]

■ Furthermore, defendants' status as PATCO officials should not immunize them from prosecution as strike leaders under § 1918(3). To so hold would be to eviscerate the enforcement of § 1918; all union leaders who are also strike leaders would escape prosecution while strike leaders from the rank and file would have no such protection. Union leadership may not be used as a shield to prosecution under 1918(3) as defendants attempt to do here. They have shown no causal connection between their status as PATCO officials and the Government's decision to prosecute. It does not follow that merely because union leadership may be highly correlated with strike leadership that the government's decision to target strike leaders is invidiously discriminatory. Moreover, aggressive display of opposition to a law and blatant defiance of authorities, challenging them to prosecute, should not give rise to immunity from prosecution. *See United States v. Rickman*, 638 F.2d 182, 183 (10th Cir. 1980); *United States v. Stout*, 601 F.2d 325, 328 (7th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979).

■ Thus we find that with respect to the national policy of targeting "strike leaders", defendants have failed to show that the government's classification was based upon such "impermissible considerations as race, religion, or the desire to prevent [the] exercise of constitutional rights." *United States v. Berrios, supra*, 501 F.2d at 1211.

*Local Implementation of National Policy*

During the hearing, much of both defendants' questioning was directed to determining who in fact placed their names upon the list and what specific evidence tended to show that they were "strike leaders", "coor-

---

4. The instructions provided that investigations of the targeted individuals be conducted and that the following additional evidence be gathered:

We asked the U. S. Attorney's offices to look at four factors, I stated them earlier, the person is an FAA Air Traffic Controller, the installation at which they worked was undergoing a job action, that they had failed to report for work as scheduled. The fourth criteria listed in that teletype is some additional evidence of the person's intent; that the person really intends to be on strike, that

they're not a laggard. They didn't have a flat tire, they're not the subject of, perhaps, coercion by strikers and they failed to go to work for that reason. In that regard, admissions, whether they be oral admissions to an FBI agent, admissions in the media, being on a picket line while they're due in the tower, those types of things we looked for as evidence that we had somebody who truly intended to be on strike.

Tr. 243 (Testimony of James Reynolds). *See also* Defs. Ex. H and Tr. 447.

dinators", "choir boys", or "cluster leaders."[5] These terms were used to describe various levels of strike organizing activity. Identification of an air traffic controller with one of these names was of great significance—even "magical", (Tr. 306, 334), in its revelation about the "secretive" strike organization. (Tr. 50–51, 175, 330).

Defendants' argument essentially is that there was no evidence they were strike leaders and that they were targeted on the basis of other impermissible criteria, primarily their union activism.

We have some question as to the validity of this approach by the defendants. First of all it must be borne in mind that the targeting policy itself is a valid one and that what is being challenged now is the possible erroneous implementation of the targeting policy. We are not convinced that even if there were an impermissible selection of a target by an FAA official, that it would taint the final determination by the Department of Justice to prosecute. The fact is that 18 U.S.C. § 1918 relates to participating in a strike. The final decision to *prosecute* both Mr. Maimone and Mr. Amato was based upon a determination by the Department of Justice that there was sufficient evidence of their strike participation to warrant prosecution under § 1918. (Tr. 199–200, 225). They were thus distinguished by the Department of Justice from the other seven persons whose names appeared upon the target list. Their selection from this list for prosecution was not shown to be based upon any invidious or impermissible considerations, since it is permissible to prosecute vocal offenders because they offer "easy detectability and proof", *United States v. Warinner, supra*, 607 F.2d at 214.

Nonetheless, despite our concern as to the necessity of doing so, we will examine the question of whether the placement of the names Maimone and Amato on the target list constituted an invidious discrimination.

As regards the defendant Anthony Maimone, we have no difficulty in rejecting this argument. There was testimony that he was known to be a "choir boy." (Tr. 305–06, 328–30, 359–60, 366–67). His name appeared as the author of an article in Terminals Cluster News-Letter with the designation "Choir boy" beneath it. (Defs' Ex. L). It was on this basis that we conclude his name was placed upon this list, although by whom it is not known.[6]

The defendant Paul Amato presents the more difficult case. Although we reach the same conclusion as to him as we do to Mr. Maimone, the evidence of his strike leadership is not as obvious or forthcoming. In fact, Mr. Charles Stafford, Chief of the Air Traffic Control Facility in Westbury, when asked whether he had ever heard Mr. Amato referred to as a "choir boy" stated that he had not. (Tr. 364–65. *See also* Tr. 613–15).

Mr. Stafford also testified to the following:

> Q   Did you ever mention Paul Amato to Dolph Sand or to anyone in Dolph Sand's office?
>
> A   I don't remember—in Dolph Sand's office, yes, I'm sorry. Dolph Sand I don't remember but I received a phone call before the strike running a list of names by me as possible choir boys. I mentioned that I'd heard those names bandied about the facility as, yes, they were possible choir boys.
>
> Q   Do you know of your own personal knowledge whether those names bandied about were choir boys?
>
> A   Later on there was an article in one of their newsletters—

---

5.   See note 2, *supra*.

6.   The appearance of Anthony Maimone's name on the list was of no surprise to Dolph Sand, Chief of the Labor Law Branch within the FAA chief counsel's office. (Tr. 330) Mr. Sand concluded, on the basis of his past dealings with Mr. Maimone and specifically Mr. Maimone's designation as a "choir boy" in the Terminals Cluster News-Letter (Defs' Ex. L) that Mr. Maimone was a strike leader. (Tr. 334). It is plausible to conclude that had the name Anthony Maimone not already appeared on the list of suspected strike leaders at the time that list crossed Mr. Sand's desk, Mr. Sand on the basis of the "choir boy" signature might have understandably placed it there himself.

Q  No, no—

MR. ROSEMAN:  I didn't ask that. I'm sorry to interrupt you but it's not responsive, Judge.

THE COURT:  It is.

MR. ROSEMAN:  I withdraw then, my objection.

MS. NORDENBROOK:  Will the Court direct the witness to complete his answer?

THE COURT:  You may complete your answer.

A  (Cont'g.)  Later on we did receive one of their newsletters that listed all the choir boys which confirmed that list.

Q  Do you know the names of that list, would you tell the Court?

A  To the best of my knowledge Gallagher, Turin, Ailes, Maimone.  When I received that call—

THE COURT:  Was Amato on that list?

THE WITNESS:  No, he was not on the list at that time, however when I received that call, he asked me if there's anymore names on there.  I assumed based on some of our conversations with Paul that the president and vice president probably should be on the list, too, so I offered those two names, Paul Amato and Tom Ruesbrech.

BY MR. ROSEMAN:

Q  Are you telling this Court you assumed that the president of the union and the vice president were also choir boys; is that what you're telling this Court?

A  It was an assumption of mine, yes.

Q  Did you ever ask Paul Amato whether he was a choir boy?

A  No.

Q  Did you ever have any conversation with Paul Amato regarding any proposed strike?

A  Yes.

Q  When was that?

A  That was the Friday before the strike.

Q  Tell us the conversation.

A  The conversation went along the lines that a strike was imminent.  He didn't see any way out of avoiding a strike.  I remember the conversation pretty well because I was a little bit disturbed about it.  Of course, I advised against a strike like I always had in any conversation regarding strike.

He mentioned, he asked me how much my car cost.  I remember this.  I told him.  He said, when he got his $72,000 raise that he was going to buy one just like it, only the newer model; that when the strike came off they were going to extend the strike one more day at the New York TRACON to remove me and I think mainly this was because some of the reform that I had started while at TRACON.

Q  Did he ever tell you he was a strike leader?

A  No.

Q  Did he ever tell you he was an arm twister?

A  No.

Q  Did he ever tell you that he induced anybody to strike?

A  No.

Mr. Amato's claim is that he was named solely because of his status as a PATCO officer.  However, it is clear from the testimony that Mr. Stafford gave the name Paul Amato not simply because Mr. Amato was the president of the Local.  Rather, he surmised on the basis of the conversations he had with Mr. Amato, as well as Mr. Amato's leadership position, that he must be a "choir boy." (Tr. 360, *see also* 396–97).[7]  The fact that Mr. Amato was the one to communicate to Mr. Stafford the union's intention to extend the strike one more day to remove

---

7.  This same error, assuming that it was an error to equate Paul Amato's role as union leader with strike leader, was made by Robert Lamb, Acting Chief of the New York facility where Messrs. Maimone and Amato were employed.  (Tr. 412–15).

Mr. Stafford is evidence of his position as a strike leader.[8]

Even assuming Mr. Stafford erred in his assumption, and we do not believe he necessarily did in this instance, this error would not constitute an invidious unconstitutional discriminatory application of the targeting policy against Mr. Amato. Rather, at most it would constitute an error of judgment by Mr. Stafford, an employee not of the Justice Department, the prosecuting authority, but of the FAA.

Having determined that defendants' motion to dismiss the indictment on the basis of selective prosecution must be denied, we turn to the other grounds for dismissal which have been set forth.

## II

Defendants Amato and Maimone also move to dismiss the indictment claiming that 18 U.S.C. § 1918(3), when read in conjunction with 5 U.S.C. § 7311, does not make striking by federal employees a crime and that 18 U.S.C. § 1918(3) is void for vagueness.

Section 7311 of Title 5 of the United States Code provides in pertinent part that:

"An individual may not accept or hold a position in the Government of the United States ... if he—

\* \* \* \* \* \*

(3) participates in a strike ... against the Government of the United States ..."

Section 1918 of Title 18 of the United States Code provides in pertinent part that:

"Whoever violates the provision of section 7311 of title 5 that an individual may not accept or hold a position in the Government of the United States ... if he—

\* \* \* \* \* \*

(3) participates in a strike ... against the Government of the United States ...

shall be fined not more than $1,000 or imprisoned not more than one year and a day, or both."

Defendants contend that 5 U.S.C. § 7311(3) and 18 U.S.C. § 1918(3) do not set forth a criminal offense, but merely state a condition of employment which prohibits persons who strike from subsequently being hired by the government.[9]

Title 18 U.S.C. § 1918 is clearly a criminal statute. Legislative history supports this construction. Congress added § 1918 to Title 18, in the middle of the criminal code, quite intentionally making it a criminal statute, with criminal penalties.[10] The

---

**8.** Mr. Amato sought to suggest on the basis of Mr. Stafford's testimony that Stafford's personal dislike for him motivated Stafford to place Amato's name on the list. (Tr. 390–97). Such a personal bias might in fact constitute an unlawful action in the context of this case. Nevertheless, the testimony does not support such a finding. Whatever animus Mr. Stafford may have held for Mr. Amato, he clearly testified as to those specific statements and activities engaged in by Mr. Amato, particularly his statement that the Local would extend the strike in order to effect Mr. Stafford's removal from his position. (Tr. 379, 391). Such a statement supports a finding that Mr. Amato did occupy a position of leadership in regards to the strike, and was not merely a non-striking union leader.

**9.** If the statutes contained only the words "may not accept" and not the additional words "or hold a position in government", this interpretation would be more plausible. In making their argument, defendants seem to be relying in

part on the opinion of the district court in *United States v. P.A.T.C.O.*, 504 F.Supp. 432, 438 (N.D.Ill.1980), *rev'd on other grounds*, 653 F.2d 1134 (7th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) which states that "Although the United States in its brief characterizes the statute as a 'prohibition against strikes in the public sector,' 5 U.S.C. § 7311 does not literally speak in those terms, but rather in terms of one of the conditions of public employment." However, the Court further notes that "Section 7311 must however be considered in conjunction with 18 U.S.C. § 1918, which makes an individual's violation of its provisions a crime ... thus the specific statutory consequence of an individual employee's strike participation is his or her potential termination of employment under Section 7311 and potential prosecution under 18 U.S.C. § 1918." *Id.*

**10.** 80 Stat. 608–09 (1966).

predecessor to § 1918, Pub.L. 84–330,[11] was meant to consolidate in a single, permanent penal statute the riders prohibiting federal employees from striking or from asserting the right to strike which previously had been attached to numerous appropriation acts.[12] Pub.L. 84–330 was modeled after § 305 of the Taft-Hartley Act[13] which made it unlawful for a federal employee to participate in a strike and provided for immediate discharge and forfeiture of civil service status for employees who did strike.[14] Section 1918(3) should be similarly construed.

■ Although as defendants note, no prosecutions under § 1918(3) have been brought prior to this strike, this Court made it clear as early as 1970 and as recently as June 18, 1981 that § 1918 makes striking against the government by a federal employee a crime[15] and this Court now specifically so holds. Furthermore, several other courts have similarly construed the meaning of § 1918(3).[16]

The defendants next claim that § 1918(3) is unconstitutionally void for vagueness. They assert that it forces individuals to speculate as to whether their conduct is prohibited and that it fails to define "holds a position" or to set forth when an individual is subject to its penalties. Defendants' argument is without merit.

■ This Court finds that this statute is not unconstitutionally vague. The plain language of the statute means that no person may strike against the government while holding a government job without being subject to criminal prosecution and penalties. In other words, a federal employee may quit his government job, but he may not strike and hold the government job at the same time.

As noted before, we have previously found this to be the plain meaning of § 1918(3).[17]

The plain meaning of the words "holds a position" in § 1918(3) is that a person "holds a position" when he is currently employed by the government. The plain meaning of the word "strike", according to Black's Law Dictionary (Fifth Edition), is:

> The act of quitting work by a body of workers for the purpose of coercing their

---

**11.** 69 Stat. 624 (1955).

**12.** *H.R.Rep.No.1152*, 84th Cong. 1st Sess. at 1 (1955); *Sen. Rep.* 1256, 84th Cong., 1st Sess., *reprinted in* [1955] U.S.Code Cong. & Ad.News 2873–74.

**13.** 61 Stat. 136, 160 (1947).

**14.** *Sen. Rep.* 1256, U.S.Code Cong. & Admin. News 1955, p. 2874 specifically refers to § 305 stating: "Section 305 of the Taft-Hartley Act requires the discharge of persons who strike against the government. This is repeated in paragraph (3) of the first section of the bill." [Pub.L. 84–330], *See also, United Federation of Postal Clerks v. Blount*, 325 F.Supp. 879, 882–883 (D.D.C.1971), *aff'd mem.* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971).

**15.** *Air Traffic Association of America v. PATCO*, 516 F.Supp. 1108, 1110 (EDNY 1981) ("strikes by federal employees continue to be illegal ... and indeed criminal ..."); *Air Transport Association v. PATCO*, 453 F.Supp. 1287, 1293 n. 4, 1294 (EDNY 1978), *aff'd*, 594 F.2d 851 (2d Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979); *Air Transport Association v. PATCO*, 313 F.Supp. 181, 185 (EDNY 1970) ("the federal law makes it a crime for a government employee to partic-

ipate in a strike ...") *vacated in part on other grounds sub nom., United States v. PATCO*, 438 F.2d 79 (2d Cir. 1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971).

**16.** *United States v. PATCO, supra*, note 9 and 504 F.Supp. at 440 ("It is absolutely clear that a federal employee who strikes ... may be prosecuted under 18 U.S.C. § 1918"); *United States v. Taylor and Florence*, No. 81–186, Slip op. at 3–4 (D.Ariz. Oct. 19, 1981); *United States v. Haggerty, et al.*, 528 F.Supp. 1286 (D.Colo. 1981).

**17.** *Air Traffic Association v. PATCO, supra*, note 15; *Air Transport Association v. PATCO, supra*, note 15, 453 F.Supp. at 1294 ("Again as Judge Judd said ... 'One of the reasons for a federal statute against strikes by federal employees is that the employees are performing an essential service for the benefit of the public ...' If defendants are dissatisfied with the conditions of this undertaking, the solution, failing negotiations or persuasion, is to seek other employment, not to engage in or encourage conduct which violates the law and their sworn oaths at the expense of and possible endangerment to the lives of innocent people and the nation as a whole.").

employer to accede to some demand they have made upon him and which he has refused.

Sections 7311(3) and 1918(3) have already been the subject of scrutiny by a federal district court which held that they were not void for vagueness or overbreadth. In *United Federation of Postal Clerks v. Blount*, 325 F.Supp. 879, 884–85 (D.D.C. 1971), *aff'd mem.* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), the plaintiff sought to invalidate the terms "strike" and "participate in a strike", as void for vagueness, but the Court held that the term "strike" is of such common usage and acceptance that persons of common intelligence need not guess as to its meaning, and that the phrase "participate in a strike" meant the act of striking, "the essence of which is an actual refusal in concert with others to provide services to one's employer." *Id.* In so holding, the court also construed the meaning of "holds a position" when it stated: "it is only an actual refusal by [federal] employees to provide services that is forbidden by 5 U.S.C. § 7311(3) and criminalized by 18 U.S.C. § 1918(3)." *Id.*[18]

### III

Defendants also assert that because portions of § 7311 have been held to be unconstitutional, § 1918 must fall or be amended before the offenses alleged here may be prosecuted. In *National Association of Letter Carriers v. Blount*, 305 F.Supp. 546 (D.D.C.1969), *appeal dismissed*, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970), the district court held that the provisions in § 7311(3), prohibiting federal employees from asserting the right to strike and in § 7311(4), prohibiting federal employees from holding membership in an organization which asserts the right to strike, were unconstitutional. It also found the strike participation prohibition in 5 U.S.C. § 7311 to be severable. The defendants argue that the unconstitutional portions of the statute are not severable from the constitutional prohi-

bition against striking against the government.

Legislative intent is dispositive here. *United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968) (Court found death penalty portion of Federal Kidnapping Act severable where the death penalty clause had not been part of the original bill). In finding that the no-strike clause in § 7311 was viable alone, the district court in *National Association of Letter Carriers v. Blount, supra*, 305 F.Supp. at 548, noted that the statute contained "a separability clause disclosing a congressional intent to retain any valid provisions if they [could] stand independently (5 U.S.C. at 87 (Sec. 7(g) of Pub.L. 89–554, 80 Stat. 631))"

■ Furthermore, the legislative history of the predecessor to § 1918, Pub.L.No.84–330, indicates that Congress originally enacted the no-strike provision separately from the restrictions (subsequently held unconstitutional) prohibiting assertion of the right to strike and membership in an organization which asserts the right to strike. *See The Third Urgent Deficiency Appropriation Act of 1946*, 61 Stat. 136, 160 (1947) *cited in H.R.Rep.No.1152, supra*, note 9, and *United Federation of Postal Clerks v. Blount, supra*, 325 F.Supp. at 882. For these reasons, this Court finds that although § 1918(3) does not contain a "savings clause", it may stand without further amendment, the no-strike clause being separate, distinct, and severable.

### IV

■ The argument that the Department of Justice, by seeking the indictment of these defendants, has violated a statement of policy set forth in a letter from Assistant Attorney General Philip B. Heymann to Mr. Langhorne Bond dated September 22, 1978, is somewhat disingenuous. By letter dated June 16, 1981, from Mr. D. Lowell Jensen to Mr. J. Lynn Helms, with a carbon copy to Robert E. Poli, the president of PATCO

---

18. The district court further noted that federal courts have broad latitude "to construe a [federal] statute in such terms as will save it from the infirmities of vagueness and overbreadth." *United Federation of Postal Clerks v. Blount, supra*, 305 F.Supp. at 885.

(defendants' union) (Gov's Ex. 3), the defendants were constructively advised that:

> In light of the recent threat of a strike by federal air traffic controllers, the Criminal Division has reviewed its policy pertaining to the enforcement of Title 18, United States Code, Section 1918. That statute makes it a crime to participate in a strike against the Government of the United States. It is apparent that any such strike by federal air traffic controllers would have a significant detrimental impact on this nation and its citizens. It is this type of occurrence that the statute is designed to prevent and punish.
>
> In order to avoid any misunderstanding and to clarify any past statements on enforcement policy in this subject area, I wish to advise you of the policy we will follow in the event of a strike. The Department of Justice will consider independently all criminal, civil, and administrative actions which may be taken based on strike conduct and will take such action as it deems proper in the circumstances. The action taken as a result of such consideration can include direct enforcement of Title 18, United States Code, Section 1918 without prior use of civil or administrative procedures otherwise available.

▬ Moreover, as the government points out, policy statements made by government agencies will not be enforced by the courts unless compliance with the policy is mandated by the Constitution or federal law. *United States v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979); *United States v. Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979), *cert. denied sub. nom., Prado v. United States*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980) and cases cited therein at n. 28.

Furthermore, the defendants were warned, not once but thrice, twice by this Court, and once by the District Court for the Northern District of Illinois, that in the event they were to strike against the government it would be regarded as a criminal act.

In 1970, as indicated above, and specifically in June of last year in *Air Transport Association v. PATCO*, 516 F.Supp. 1108 (E.D.N.Y.1981), this Court said that "... it is of crucial importance that strikes by federal employees are substantially more than merely unfair labor practices—they are crimes", *id.* at 1112. And in *United States v. Professional Air Traffic Controllers Organization, et al.*, 504 F.Supp. 432 (N.D.Ill. 1980), *rev'd on other grounds* 653 F.2d 1134 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981), the Illinois District Court said:

> Section 7311 must however be considered in conjunction with 18 U.S.C. § 1918, which makes an individual's violation of its provisions a crime, and 18 U.S.C. § 2(a), which subjects anyone aiding and abetting commission of a federal crime to punishment as a criminal principal. Thus the specific *statutory* consequence of an *individual employee's* strike participation is his or her potential *termination of employment* under Section 7311 and potential *prosecution* under 18 U.S.C. § 1918. As for a *labor organization*, in *statutory* terms its exposure is to potential *prosecution* under 18 U.S.C. § 2(a).

*id.* at 438, and

> During the next few days Title VII was amended to, in the words of the amendment's sponsor Representative Rudd, "re-state in clear and unequivocal language that strikes against the Federal government are illegal and punishable" (*id.* at 9640).

▬ Accordingly there is no doubt whatever that 5 U.S.C. § 7311 and 18 U.S.C. § 1918 and § 2(a) were left totally intact by the enactment of Title VII. It is absolutely clear that a federal employee who strikes still forfeits his or her right to employment under Section 7311 and may be prosecuted under 18 U.S.C. § 1918. It is equally clear that a labor union that participates in such a strike may still be prosecuted as well under 18 U.S.C. § 2(a). In that important sense

the strike is truly illegal: It is a *criminal* offense.

*id.* at 439–440.

## V

 Finally defendants argue that, when on August 3, 1981, the President set a deadline of August 5, 1981 by which Air Traffic Controllers who failed to report to work were to be terminated from employment, such step constituted a condonation of the strike actions and an amnesty, reprieve or pardon within the President's power conferred by Article 2, Section 2, Clause 1 of the Constitution of the United States. This argument might have some merit with respect to those who did return to work before the deadline on August 5, 1981, but it is in this Court's opinion specious and frivolous as to those who did not.

## VI

Defendants also move for a severance and separate trials under and pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure.

Rule 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defend-

ants which the government intends to introduce in evidence at the trial.

There is no question but that each defendant here is alleged to have participated in the same act constituting an offense, i.e., a strike against the government. There just is no legitimate reason advanced by either defendant for either a severance or a separate trial in this case.

Accordingly, defendants' motions must be, and the same hereby are, denied.

SO ORDERED.